UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANGELA CLEMENTE,
c/o Attorney Jim Lesar
930 Wayne Avenue Unit 1111
Silver Spring, MD 20910

                                 Plaintiff,

        v.

FEDERAL BUREAU OF INVESTIGATION
935 Pennsylvania Avenue, NW
Washington, D.C. 20535

        and

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

        and

JOHN DOE AGENCY #1 through JOHN
DOE AGENCY #10,

                         Defendants

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**(Freedom of Information Act, 5 U.S.C. §552 *as amended*, Privacy Act, 5 U.S.C. §552(a) *as amended*; President John F. Kennedy Records Collection Act of 1992 44 U.S.C. §1107 note (JFK Records Act)**

**JURISDICTION AND PARTIES**

1. Plaintiff Angela CLEMENTE ("CLEMENTE") brings this action under the Freedom of
Information Act ("FOIA", 5 U.S.C. §552), *as amended*. Privacy Act, 5 U.S.C. §552(a) *as amended*;
President John F. Kennedy Records Collection Act of 1992 44 U.S.C. §1107 note (JFK Records
Act)

2. Plaintiff is a well-known forensic intelligence analyst, paralegal and congressional consultant.
She brings this lawsuit to enjoin the UNITED STATES DEPARTMENT OF JUSTICE ("JUSTICE") and
the FEDERAL BUREAU OF INVESTIGATION ("FBI") from withholding information she has
requested. She demands prompt disclosure as required by law.

BACKGROUND

3. Over the past two decades, plaintiff has conducted an exhaustive examination related to the
FBI and their handling of taxpayer-funded, Top Echelon Informants (TEICP).  CLEMENTE has also
spent years gathering information about the failure of the FBI to protect victims of their
criminal informants who continue to victimize others while working under the auspices of the
FBI. In 2016, CLEMENTE began working as a consultant on the Spike documentary, "Gone—The
Forgotten Women of Ohio." That series, submitted for a Peabody award, dealt with, in part,
murdered and missing women and informants; corruption; and human and drug trafficking.
JEFFREY EPSTEIN (EPSTEIN) is alleged to have been trafficking women across the country and he
had strong connections to the State of Ohio. EPSTEIN had a home in Palm Beach, Florida where
some of his crimes of trafficking women occurred.  An FBI document that CLEMENTE is in

possession of states the following: "Epstein has also provided information to the FBI as agreed upon." This document demonstrates that he was cooperating with the FBI and providing information on some level in which the FBI thereafter requested to close a specific subfile. *See* Attachment 1.

4. During and after the Spike series, CLEMENTE interviewed many people; two of them later spoke of their knowledge of women being transported to "Florida," "Palm Beach, Florida," and areas of Ohio for prominent business men to engage in sexual activity.

5. Additionally, it is reported that in 2017, a local newspaper reporter from Scioto County, Ohio released a sealed warrant application that named two men in it. Their names were MARK EUBANKS ("EUBANKS") AND MICHAEL MEARAN ("MEARAN") and it asserted that two unnamed Judges were subjects of a federal Human and Drug trafficking investigation.

6. Also in 2017, underline prior to the reporter's release of these documents, CLEMENTE and several attorneys had a meeting with a Department of Justice Office of Inspector General (DOJ IG) senior agent about the warrant application documents that had been provided directly to CLEMENTE by one of the many subjects identified in the federal investigation.

7. During this meeting and in subsequent communication's CLEMENTE also addressed the federal authorities' failure to interview critical witnesses who were willing to cooperate and provided important singular information. These same willing witnesses reported concerns to CLEMENTE for their continued employment and safety if they disclosed the information that they possessed, some of which identified corruption and collusion with local, state and federal officials. Some of the officials were identified by name. These law enforcement whistleblowers

although fearing for their safety and their employment made themselves available to the DOJ IG, CLEMENTE and the FBI but upon information and belief none were ever interviewed by the FBI.   Additionally, on information and belief none of the other witnesses, one who was able to identify a federally indicted (alleged informant) in a homicide has been interviewed about the subject's identity or role in the homicide. This particular witness was offering to provide the location of a woman's body who is currently missing. The witness had intricate details of her death however the witness needed protection due to the sensitivity of the case and the concern of the witness's informant status with local and state officials who recently placed his life in jeopardy.

8. Another person was identified in the federal warrant application as being part of the "EUBANKS/MEARAN organization." The subject explained that, "the party would meet with the defense attorney in Columbus with guys from out of state." And that, "Some of the girls were from Portsmouth, Chillicothe, and Columbus, Ohio and the defense attorney was always eager to obtain company to go with him and his buddies to Palm Beach."

9. Another witness who was willing to cooperate with the FBI and federal prosecutors had information about another homicide on a different missing woman case. This witness confessed to bringing women and drugs to Florida for an Ohio criminal defense attorney who targeted young women for interstate trafficking to Florida. This witness further stated that she/he later became a target of this attorney. Upon information and belief this witness was also not interviewed by the FBI. These are some examples of the FBI's failure to act on criminal activity even when it was brought to their doorstep which further allowed those being trafficked to continue being victimized.

10. In another example, CLEMENTE provided an agent from State of Ohio Bureau of Criminal Investigation (BCI&I) Agent Larry McCoy (MCCOY) the opportunity to interview a female witness who was located in a prison. CLEMENTE and MCCOY met with the witness and MCCOY interviewed and recorded the witness with her consent about her knowledge of a drug task force officer allegedly taking monetary bribes from a convicted federal drug trafficker who is also an alleged local, state and federal informant and human trafficker. This female witness stated that she had been brutally raped by a man she identified as Earnest "Dollar Bill" Moore. On Information and belief no arrests, indictments or convictions were made of the alleged federal, state and local informant or the task force officer identified by this witness. This task force officer is still employed.

11. MCCOY who identifies himself as having the moniker of "many" and often acting under the federal authorities or more precisely the "FBI was his boss" admitted while interviewing a witness reportedly for the FBI that his State BCI&I boss "wasn't even aware that he was there."

12. After MCCOY's interview of this State Parole Officer witness she was later placed in serious danger. After his interview other officials from the Pike County Sheriff's Office disclosed information that led to identifying that she was cooperating and/or assisting with providing information to federal and congressional officials which included the DOJ IG's office.

13. She later requested a formal investigation about how the disclosure took place but the file on the internal investigation suddenly went missing and upon information and belief it still remains missing. Why did this matter? Because McCoy stated the FBI was his boss and part of her reporting information to the federal and congressional officials (confidentially) was because

she felt McCoy was there to thwart a legitimate investigation into the person she was reporting

on. Her reports to congress and federal authorities had some concerns possibly related to

interstate human trafficking. On information and belief, she has never been interviewed by an

FBI agent despite the DOJ IG's office submitting her information for further investigation to the

FBI's INSD Division related to both public corruption and criminal activity. Upon information

and belief, the same officials who disclosed her status are now under federal investigation

themselves for a completely different matter.

14. An additional example in Ohio of another federally tasked officer for Ross County Sheriff's

Office, JOHN WINFIELD (WINFIELD) who was working with BCI/"FBI" Agent MCCOY (and FBI

Agent David Knight), on Ohio missing and murdered women's cases has been identified as

being related to one of the alleged murderers of a currently missing women. On information

and belief, he was also removed from his position on the Federal Task Force and abruptly quit

his Ross County Sheriff's Office position but was afforded the gift of no federal investigation or

prosecution and was simply sent to a Kentucky Rehabilitation facility which he reportedly left

early without incident. *See* Attachment 2.

15. Victim's families and witnesses that CLEMENTE has interviewed claimed that WINFIELD

refused to investigate information that may have led to additional later incidents of trafficking

and deaths.

16. The final four examples are those that CLEMENTE has a long history of litigating and/or

providing congressional reports on related to the four most known top echelon informants or

alleged informants such as Gregory Scarpa Sr., Frank Sparaco, James J. Bulger and Gregory

Scarpa Jr. In each of these CLEMENTE showed the following:

(a) Gregory Scarpa Sr., (SCARPA) was committing violent crimes while working for the FBI for

nearly three decades with little to no punishment or jail time despite the FBI's knowledge that

he continued to commit crimes that led to many victims being killed. Dr. Stephen Dresch

(DRESCH) and CLEMENTE brought this information to several congressional committees which

later led to their assisting the Brooklyn District Attorney with an investigation that further led to

SCARPA SR.'s FBI Supervisory Special Agent R. Lindley DeVecchio being indicted on four counts

of second-degree murder. Thereafter both the U.S. House of Representatives Committee on

Government Reform and the DOJ IG's office used DRESCH AND CLEMENTE'S example cases of

failure for their own example cases which later led the FBI into revising their informant

practices. (*See* September 2005 DOJ IG Special Report)

https://oig.justice.gov/special/0509/index.htm

The result of SCARPA SR.'s cooperation led to more victims' deaths than convictions. It also led

to wrongful convictions, extensive *Brady* violations and tax evasion. According to news reports

SCARPA died of AIDS in prison but was afforded private unmonitored phone calls with his

mistress after his conviction. One of the documents released in *CLEMENTE v. FBI* was where

SCARPA had identified over 20 officers in the 62nd Precinct in Brooklyn as being corrupt or

taking bribes. Upon information and belief no one was arrested or charged with a crime. The

FBI continues to withhold documents and other materials on this case despite his death in

1994.

(b). Frank Sparaco (SPARACO) was a top echelon informant for the FBI for at least twenty years. He admitted to CLEMENTE about his role in three separate homicides. On one of these homicides FBI Agent Christopher Favo ("FAVO") and prosecutors Andrew Weissman ("WEISSMAN"), John Gleeson (GLEESON), and George Stamboulidis ("STAMBOULIDIS") upon information and belief knew that SPARACO committed the murder and allowed another man Michael Sessa (SESSA) to be indicted for it.  At that same time, they were making back-door deals for SPARACO to receive lenient treatment, in part, related directly to that very murder that SESSA was wrongly charged on but SPARACO had admitted to.

This information was later discovered more than a decade after Sessa had already been sentenced to life in prison. The FBI document was clear *Brady* material that took place on April 15, 1993 and was part of an in-chamber proceeding that took place before Judge Jack Weinstein. *See* Attachment 3.

Two other men are currently serving time on two additional murders that SPARACO helped commit. SPARACO is living life as a free man while the three men mentioned above are still fighting for their lives. SPARACO admitted to CLEMENTE that while working with Scarpa they had murdered as many victims while working under the auspices of the FBI.

(c). James J. Bulger (BULGER) has been alleged to be a top echelon informant also for decades. Up until his recent brutal murder while housed at Hazelton federal prison located in Bruceton Mills, West Virginia he denied those allegations and instead he claimed to be receiving information from the FBI. In the documentary U.S. v James J. Bulger, CLEMENTE identified that the alleged voluminous file that the prosecution claimed the FBI had provided them was not

voluminous at all and in fact that documents had to have been withheld because only a small fraction of records were available to both prosecution and defense. Attorney Jim Lesar (LESAR) identified the failures in the processing of these documents and was called as a potential witness by defense attorney Hank Brennan.

BULGER had committed violent crimes for years and if he was an informant the FBI failed miserably in keeping the public safe but they certainly are doing exceedingly well in keeping the documents related to BULGER safe and protected from the public and his victim's families.

(d). Gregory Scarpa Jr. (SCARPA JR.) was a limited informant who provided information on terrorists such as Ramzi Ahmed Yousef, Khalid Sheikh Mohammed and Terry Lynn Nichols. His intelligence led to CLEMENTE and DRESCH providing Congress, the State Department, and the FBI information that led to the recovery of the missed explosives that were hidden ten years earlier that was part of the horrific terrorist attack in the Oklahoma City Bombing that killed 168 people including 19 children and injuring more than 500 people.

CLEMENTE AND DRESCH repeatedly addressed this issue pushing the FBI to act until eventually the FBI was forced by Congressional Chairman Dana Rohrabacher (ROHRABACHER) to act on the intelligence.  CLEMENTE and DRESCH had been reporting to ROHARBACHER and CLEMENTE was consulting with him. Once the FBI was forced to act the explosives were found exactly as they were described and, in the location, that CLEMENTE, DRESCH AND SCARPA JR. reported. The FBI did not act on the information until they were forced to take action thankfully due in large part to Congressman Dana Rohrabacher's assistance.

17. In most of these examples from Ohio to three of the four cases just described the FBI withheld complete or partial documents claiming law enforcement exemptions. And many of these cases described, if not all, that the FBI failed to act on extremely important information. This is an ongoing pattern and if officials allow informants to commit violent crimes, ignore willing witnesses or law enforcement whistleblowers because it exposes the FBI's own failure then you have a systemic pattern that needs to be addressed and meticulously examined by the courts when the defendants shield themselves under law enforcement exemptions claims and withhold documents and materials.

18. CLEMENTE fails to see how the FBI has any ongoing investigation without speaking to willing witnesses. Some of these witnesses possess physical evidence in potential drug and human trafficking cases that claimed lives. Many of these witnesses are adamant to not speak with any state or local law enforcement citing concerns with corruption and that the cases involve federal crimes. In this disturbing pattern it continues to appear on a repeated basis that the FBI and others mentioned herein may be protecting those who are committing the crimes.

19. There were more deaths in each of these cases or harm to victims than there was benefit of ANY prosecution.  The prosecutions from each of these cases appear minimal if any. CLEMENTE has addressed these concerns before for other law enforcement officials whose information was also dismissed after it was brought to what CLEMENTE terms as "the clean-up crew" of Angela L. Byers a former FBI SAC for the Cincinnati Division of the FBI and the former head of the INSD Division of the FBI. BYERS was the Special Agent in Charge (SAC) when allegations of criminal activity was reported on EPSTEIN.

20. CLEMENTE spent years gathering information on top echelon informants such as Gregory Scarpa Sr. and Frank Sparaco. She also addressed criminal activity committed by James J. Bulger who committed violent crimes while having an ongoing relationship with the FBI.  SCARPA SR. was directed to pay taxes on the money that he received from his earnings with the FBI but didn't.

21. In the cases of SCARPA SR. and SPARACO and what appear to be the cases of EPSTEIN AND MOORE few solid convictions have taken place based on their "work" for the FBI versus the damage that has been caused with 100's of victims who were irreversibly harmed. The foregoing facts violate the standards for meeting the law enforcement threshold under exemption 7E. *Pratt D. Webster* 673 Fed 2[d] 408 (D.C. Cir. 1982) *Pratt* construed exemption for law enforcement purposes 7 "compiled for law enforcement purposes" threshold a manner very deferential to law enforcement agencies. However, there is a critical distinction between *Pratt* and this case. In *Pratt,* the FBI cited a memo explaining its COINTELPRO program against the black power party which listed five goals of the program on the basis of these professed goals *Pratt* ruled the FBI had submitted sufficient evidence to receive protection from disclosure under Exemption 7 but one of the goals was to "prevent violence on the part of the Black Nationalist Groups" *Id at 422.* In the cited *Clemente* case Lesar argued, "the activities of… the FBI in this case were not designed to prevent violence, they fostered it." Oral argument transcript at 4.

 In *John Doe agency* the John Doe Corp*.,* 495 U.S. 146 (1992) the Supreme Court construed the exemption 7 threshold in a manner in which, "recognized the balance stricken by congress between the public interest in greater access to information and the Government's need to

protect certain kinds of information from disclosure and supported by the FOIA's legislative history. *Id. at 146, citing PP. 153-158*

Three justices dissented. Although the court stated that it had applied the "plain meaning rule" and narrowly construed the exemption 7 threshold, Justice Scalia was sharply critical "narrow construction of an exemption means if anything, construing ambiguous language... in such fashion that the exemption does not apply" *Id. at 161 (Scalia dissenting).* He noted that *Roget's Thesaurus of Synonyms and Antonyms include* "complied in the following list of synonyms" compose, constitute, form, make; make up, fill up, build up; weave, construct, fabricate; compile; write, draw; set up (printing; enter into the composition of, etc. (be a component). *"Roget's Thesaurus 13 U.S. (Roget Component). "Roget's Thesaurus 13 U.S. Roget REV. 1972).*

22. The regime that the court's interpretation establishes lends itself to abuse so readily that it is unlikely to have been intended. Id at 61

23. It is clear that the abuses detailed by CLEMENTE above were intended.

24.  The efforts that CLEMENTE and others have made to obtain critical information from the FBI about these relationships have not been accommodated.  In fact, the FBI is wrongly claiming exemptions for "law enforcement purposes." In this case, the Exemption 7 threshold does not apply because the FBI has significant involvement in the complicity – conspiracy (or ongoing criminal enterprise). Therefore, the government must release the records sought because disclosure is in the public interest. And to hold those in government service accountable not simply continue to hide under the law enforcement exemption. It is the role of the Freedom of

Information and other disclosure acts to hold the government accountable rather than sanctioning such abuses.

25. Here the FBI has failed to meet the burden imposed upon it to justify non-disclosure in light of the circumstances set forth above. In addition, in this case the activities detailed above suggest a grandiose scheme to use the FBI's top echelon informant program to violate the rights of victims on a colossal scale.  The evidence of a long-standing pattern of abuse is sufficient for the court to find that the balance of interest tilts heavily in favor of disclosure.

26. In *Clemente v. FBI* Civ. No. 13-cv-108 (TFH) CLEMENTE expressed similar issues that the records sought related to an issue of national importance specifically the pervasive corruption with top echelon informants.  The records sought in this lawsuit identify the FBI's collaboration with high ranking informants who were involved in dangerous activities. These activities infringed upon the life and liberty of victims that were caused irreversible harm and, in some cases, included their death.

27. U.S. District Judge Thomas Hogan's decision filed January 27, 2014 stated, "CLEMENTE, has studied these issues for the past ten years and her knowledge of the facts and the major players make her a valuable resource for law enforcement and others investigating alleged corruption. Clemente also represents persons whose family members were victims of Scarpa's alleged victims in pending legal cases." In this case the evidence of abuse is even stronger. CLEMENTE is assisting many victims' families towards prosecuting the perpetrators and holding accountable those officials who were complicit in several of these cases mentioned.

28. CLEMENTE seeks records that are being withheld by those she alleges may be complicit in these crimes. CLEMENTE offered physical evidence of a discussion about a homicide victim from Ohio. The victim had alleged ties to a defense attorney who is currently under investigation and has previously been under federal investigation for allegations of human trafficking and white slavery.

29. Clemente has offered to provide authorities with information that was related to other possible criminal activity of an official in public office who was under investigation at the time that he allegedly used a computer that appears to have incriminating evidence. Upon information and belief, the DOJ has not addressed or taken possession of this evidence.

## COUNT 1-

30. Plaintiff realleges the allegations set forth in paragraphs 1-29 above.

31. By letter dated January 22, 2020 Plaintiff and three attorney's submitted a request to FBI Headquarters ("FBIHQ") for any informant files, records or materials on or pertaining to Jeffrey Epstein, including but not limited to any informant file or Top Echelon (TE) informant file, Confidential Human Source (CHS) Reporting documents, and any Federal Central Inmate Monitoring System (CIMS) records wherever they may be located or filed and in whatever form or format they may be maintained. *See* Exhibit 1.

32. By January 31, 2020 FBIHQ acknowledged receipt of Plaintiff's request and assigned it FOIPA No. 1115387 and administratively closed it citing that the records that CLEMENTE sought were exempt from disclosure pursuant to 5 U.S.C.  §552(b)(7)(A). The FBI also explained that some of the records that Plaintiff sought have been released and are on the FBI's FOIA Library (The

Vault). And finally, the cited other portions were sent to the Department of Justice with respect to other records they would neither confirm nor deny whether they existed. *See* Exhibit 2.

33. Plaintiff's request is limited to the first 500 pages falling within the identified categories with some additional modifications:

(a) All warrants or drafts of warrants based in whole or in part on information submitted or provided by Mr. Epstein, including all information submitted by Epstein which was used to support warrants or drafts of warrants based on information provided by him. These records are of particular interest because Mr. Epstein was identified as cooperating with the FBI in an FBI document dated 9/18/08 on a child prostitution and forfeiture case against him. In this document the case agent advised that no federal prosecution would occur as long as Epstein continued to uphold his agreement.

(b) Any and all information related to Mr. Epstein in which the FBI identified an associate of Mr. Epstein's criminal activities or his criminal enterprise. Please include in those records where identification was made of a victim or an associate or recruiter of Mr. Epstein's that left from, or were taken to, ANY locations in Kentucky, New Jersey, Ohio, or Palm Beach, Florida. Please also include records identifying what geographical areas the victims, criminal targets, or Epstein's associates were from, such as the counties, cities, towns, suburbs, and any unincorporated communities' name.

(c) Please also identify and release all records in the files that mention criminal targets or associates of Epstein that held positions in public office or were identified as attorneys or judges located in the state of Ohio.

(d).   All records pertaining to or referencing Portsmouth, Ohio Attorney Michael Mearan. Also include records pertaining to or referencing William Marshall or Mark Eubanks.

(e).  All records in any informant file in chronological sequence, commencing with the present year 2020 through to the earliest date.

(f). All records that has FBI employee Angela L. Byers name, or codename, or signature, or initials on them pertaining to any Epstein investigation related to Ohio or mentioning Ohio, New York, New Jersey, or Palm Beach, Florida. Many cases that CLEMENTE, and law enforcement officials, have requested the FBI to investigate related to FBI informants and their handlers' informant practices were regularly dismissed by Angela L. Byers and the offices in which she was employed.

 Angela L. Byers' former office was located in Cincinnati, where she was a Special Agent in Charge (SAC).  At the time, she was a SAC over one of the FBI agents and a BCI agent that the DOJ IG's office submitted for investigation to the FBI's INSD division (a division in which she had previously been employed) for further investigation.  But upon information and belief not one witness (including law enforcement whistleblowers) that agreed to cooperate with the FBI officials, was contacted by the FBI.

(g) All records pertaining to Epstein victims associated in any way with Ohio or pertaining to Ohio, Kentucky or New Jersey that were taken to Palm Beach, Florida or were brought from Palm Beach, Florida to other states or countries including which states or countries the victims were brought to by Epstein or his associates.

(h) All records pertaining to any FBI internal investigations related to Epstein, or Epstein and Ohio, whether located in the FBI Inspection Division (FBI-INSD), National and Transnational Organized Crime section, Office of Professional Responsibility, Public Corruption Division, Units, or Offices, Violent Crime Divisions, FBI Cincinnati Field Division (White Slave Trafficking investigation) FBI Cincinnati Field Division Human trafficking investigations, FBI Detroit Field Division Extortion Investigation, FBI Cincinnati Field Division Mexican Drug Trafficking Organization investigation files, FBI Cincinnati Field Division Violent Gang investigation or DEA Cincinnati Resident Office Investigation referrals to the FBI; and also FBI civil litigation division files or records of any kind whatsoever, and Counter-Intelligence Sections.

34. The requested material is important because, during Clemente's investigation in Ohio, both on and after the television series on Spike had ended and through to the present date, several attorneys and CLEMENTE has communicated with senior agents at the Department of Justice Office of Inspector General. During these communications they provided information related, in part, to corruption and a human and drug trafficking ring that involves girls that were being trafficked from or were recruited from Ohio and Kentucky and were taken to Palm Beach, Florida and other areas of Ohio, New Jersey and other states.

35. Concerns involved are related to informant[s] who have admitted either a direct role or knowledge of alleged perpetrators participation in at least two homicides. One of the mentioned murder victims is still missing. The woman that is still missing was a client of a defense attorney who was and currently is the subject of an interstate human and drug trafficking investigation in which the DEA had previously provided to and referred to the FBI

that included trafficking females to Palm Beach, Florida, New Jersey and other states

throughout the U.S. and recently the local and state authorities BCI&I raided the subjects office.

https://www.cincinnati.com/in-depth/news/2019/03/21/sex-trafficking-trapped-and-trafficked-portsmouth-ohio/2839816002/,

https://www.usatoday.com/story/news/investigations/2020/03/26/michael-mearan-portsmouth-ohio-detained-home-searched/5082518002/)

36. One of the many persons identified in the DEA document as being part of the

"Eubanks/Mearan organization" has explained that she/he would meet with the defense

attorney in Columbus with guys from out of state. Some of the girls were from Portsmouth,

Chillicothe, and Columbus, Ohio and that the defense attorney was always eager to obtain

company to go with him and his buddies to Palm Beach.[1]

37. Aside from the DEA referral, in 2017 the Department of Justice Office of Inspector General

received from the Senate Judiciary's office and CLEMENTE direct information about this and

other concerns related to alleged public corruption with Ohio that was directed to the FBI's

INSD Division for further investigation.

38. CLEMENTE and her colleagues (including multiple attorneys) were then referred to the U.S.

Attorney's Office for the Southern District of Ohio over concerns related to the public

corruption aspect, which included information on an FBI agent, a State of Ohio Bureau of

---

[1] This was a sealed DEA warrant application that was made public information by Cincinnati Enquirer on 3/21/19 and again by USA today in the same year. https://www.cincinnati.com/in-depth/news/2019/03/21/sex-trafficking-trapped-and-trafficked-portsmouth-ohio/2839816002/

Criminal Investigation Agent (who worked on the federal task force), a lead detective on a federal task force for murdered and missing women, and an attorney and a judge. The judge has since been suspended in a separate matter, and is now retired.  (https://www.portsmouth-dailytimes.com/news/48590/ohio-supreme-court-denies-marshalls-appeal).  The defense attorney is currently under an investigation involving human trafficking and other major crimes. https://www.cincinnati.com/story/news/your-watchdog/2020/03/25/michael-mearan-detained-home-searched/2443837001/).

39. The detective on the federal task force has been removed from his position with the federal authorities and thereafter abruptly resigned from his position with the Sheriff's Office of Ross County, Ohio, which he was employed by while working on the federal task force.  *See* Attachment 2 *Supra*

40.  A detective who, on information and belief, possessed a fictitious New Jersey ID, was also under both state/federal investigation and has since retired in 2019. The records that CLEMENTE is requesting here will shed light on the government operations that are flawed in which appears to have essentially provided a ripe opportunity for more victims to be victimized and sexually exploited by informant[s], and those who hold a position in public office in which these victims and their communities were reliant upon for their safety and the proper application of the law.

41. Moreover, one local low-level informant was willing to provide the location of the body of a woman who remains missing, but the Ohio Bureau of Criminal Investigation Agent who was on

the federal task force and the FBI Agent chose not to address the informant's information.  He was an admitted participant in the woman's homicide.

42.  The lead detective on the case mentioned above was the detective that was also on the federal task force with the FBI and BCI Agent mentioned above.  He has since resigned from his position after the discovery of alleged misconduct related directly to him.

43.  At least one of the missing victims was a client of the defense attorney who was under investigation for interstate human trafficking of women to Palm Beach, Florida and other states.

44. Upon information and belief these documents may shed light on the FBI's failures to protect murdered and missing women in Ohio, and those trafficked to Palm Beach, Florida, New Jersey and other states.

45. One of Jeffrey Epstein's victims reported that she was taken to one of his (Epstein's) associates homes, in Ohio, and assaulted there. A lawsuit is pending on this issue.

https://myfox28columbus.com/news/local/wexner-spokesperson-says-ties-have-been-severed-with-epstein-for-more-than-a-decade

46. Plaintiff further demands that her request be placed in the "short hit queue" by the FBI.

47. Plaintiff has exhausted her administrative remedies.

48. Plaintiff has a legal right under the FOIA to obtain the information she seeks, and there is no legal basis for the FBI's denial of said right.

## COUNT 11- FEE WAIVER

49. Plaintiff realleges the allegations set forth in Paragraphs 1-48 above.

50. By letter dated January 22, 2020 Plaintiff requested a public interest fee waiver pursuant to 5 U.S.C. §552 (a) (4) (A) (iii). In her application for a fee waiver, plaintiff states that the disclosure of the information she seeks will shed significant light on government operations and or activities, including on such matters as (a) The FBI's knowledge about Epstein's criminal activities while he was serving as an FBI informant; (b) the extent to which Epstein's relationship to the FBI corrupted the system of Justice; (c) how many victims were identified after the FBI chose to not prosecute Epstein in 2008; (d) whether Epstein was working and conspiring with others in public office who facilitated his conduct, by among other things, contacting victims and scheduling or facilitating sexual encounters with Epstein or his associates (some of whom are or may currently be under state and federal investigation in geographical areas such as Scioto, Ross, and Franklin Counties, Ohio), especially as related to interstate human trafficking and murder.

51. CLEMENTE has been investigating and has been in direct communication with the U.S. Attorney's Office Southern District of Ohio where CLEMENTE was directed after the DOJ IG's office referred some of these cases over to the FBI's Internal Investigations Section for review. Upon information and belief none of the witnesses as stated earlier in this complaint were interviewed by the FBI.

52. Plaintiff further states in her fee waiver application that she is capable of disseminating the information obtained to the public through various prominent members of the news media, who have already indicated interest in this lawsuit and the disclosure of any records obtained as a result of the suit.

53. Plaintiff requests a public interest fee waiver pursuant to 5 U.S.C. §552(a)(4)(3)(iii). She is entitled to such a waiver and was previously awarded a fee waiver for records pertaining to such matters. *See Clemente v. F.B.I.,* 741 F.Supp.2d 64, 74-77 (D.D.C. 2010)

54. Plaintiff is entitled to a waiver of search fees and copying costs, and there is no legal basis for the denial of said right.

**WHEREFORE,** Plaintiff prays that this Court:

1) Order defendants to make the requested information promptly available to her;

2) Order defendants to grant plaintiff a waiver of search fees and copying costs pursuant to 5 U.S.C. §552 (a)(4)(A)(iii);

3) Order defendants to conduct a thorough search for all responsive records;

4) Order defendants to provide plaintiff a Vaughn  index inventorying all responsive records and itemizing and justifying all withholdings;

5) Order defendants to expedite this action in every way pursuant to 5 U.S.C. §552 and 28 U.S.C. §1657;

6) Order defendants to place Plaintiff's request in the "short hit" queue;

7) Award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552(a)(4)(E) and/or 28 U.S.C. §2412(d); and

8) In the event that this court orders any information by Plaintiff's request withheld the court shall order that such information be preserved until such time as it becomes available to the public by law; and that the government shall notify Plaintiff or her heir or successor or asignee of its intent of the forthcoming  disclosure of such information 10 days prior to its release.

9) Grant such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

Angela Clemente

Angela Clemente

James H. Lesar

Attorney, James H. Lesar #114413
930 Wayne Ave., Unit 1111
Silver Spring, MD 20910
Phone: (301) 328-5920
Email: jhlesar@gmail.com

Dated: June 9, 2020