ATTACHMENT

3

1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - X
 3
 4   RE:   IN CHAMBERS PROCEEDING      :

 5                                         United States Courthouse
                                       :   Brooklyn, New York
 6

 7
                                       :   April 15, 1993
 8                                         9:30 o'clock a.m.
     - - - - - - - - - - - - - X
 9
                    TRANSCRIPT OF IN CHAMBERS PROCEEDING
10            BEFORE THE HONORABLE JACK B. WEINSTEIN
                    UNITED STATES DISTRICT JUDGE
11

12
     APPEARANCES:
13
     For the Plaintiff:      MARY JO WHITE
14                           United States Attorney
                             BY:  JOHN GLEESON, and
15                                GEORGE STAMBOULIDIS
                             Assistant United States Attorneys
16                           225 Cadman Plaza East
                             Brooklyn, New York 11201
17

18

19

20

21   Court Reporter:        Henry R. Shapiro
                            225 Cadman Plaza East
22                          Brooklyn, New York
                            718-330-7687
23

24   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
25
```

HENRY SHAPIRO          OFFICIAL COURT REPORTER

3

```
1          THE COURT:  Is this a grand jury matter?

2          MR. GLEESON:  Yes.

3          THE COURT:  Is there another identification that you

4    can give?

5          MR. GLEESON:  In re:  Grand Jury proceeding, our

6    continuing Colombo Family investigation.

7          MR. GLEESON:  John Gleeson.

8          Thank you for seeing us this morning.

9          We've asked to see you in connection with this grand

10   jury proceeding.  I should first mention why we've asked to

11   see the Court.  This relates to our continuing grand jury

12   investigation into the Colombo Family, and resulting

13   indictments have been before the Court, some indictments are

14   currently pending before the Court, and we're here

15   specifically-- basically to make a record with respect to a

16   proposed contact with a represented target of the

17   investigation, and in fact he's not only represented in

18   connection with the grand jury investigation, but there are

19   Sixth Amendment implications as well, because he has already

20   been arrested.

21         We're here before, your Honor, as opposed to the

22   miscellaneous judge or another judge, because the case, once

23   indicted, will be before the Court, unless the Court decides

24   otherwise, for there are a number of other indictments arising

25   out of the investigation.
```

4

1          Specifically, an individual by the name of Frank

2    Sporacco also known as "Frankie Blue Eyes" about whom the

3    Court has heard some testimony, not a lot.  You may recall he

4    was arrested on April 4th, with Teddy Persico and with Carmine

5    Sessa.  Sporacco has been arraigned on a complaint.  He had

6    not been previously been indicted, although Sessa was a

7    fugitive.  Sporacco and Persico were arraigned on a complaint,

8    and with the government's consent both Sporacco and Persico

9    have been released on conditions that include home detention.

10   In fact yesterday, Sporacco, who is represented in this period

11   where he-- there is a case pending against him, by an attorney

12   Michael Worshor.  Sporacco -- the Court, by way of background,

13   there has been -- the phenomenon I'm about to describe is not

14   a new one to us, it's starting to occur more and more

15   frequently.  There have been a number of people involved in

16   organized crime who have decided to cooperate with the

17   government-- Sporacco may be one of those, because yesterday

18   he reached out for FBI agents who are working with us, two of

19   those agents are in the Court's vestibule just in case the

20   Court wants to inquire of them.

21          Sporacco has reached out directly to the agents and

22   says that he wants to talk.  We have reason to believe he

23   wants to talk about cooperation.  Yesterday when we learned

24   this from the agents, we told them that we have both an

25   ethical obligation and an obligation that arises from the

HENRY SHAPIRO          OFFICIAL COURT REPORTER

1  Sixth Amendment, that precludes us under normal circumstances

2  from any contact with someone who has both been arrested and

3  represented by counsel, without the consent of their

4  attorney.

5          What we propose to do -- by the way, we have had

6  sufficient contact with Sporacco, we asked the agent to do

7  this, to ask him whether -- what the reason is, why he doesn't

8  want his attorney involved in his communications with the

9  government, and his reason, which is no surprise to us, and

10 it's a concern, and this is by no means to derogate Michael

11 Worshor, which translation sends who the individual lawyer is,

12 but this prospective witness, he's currently a defendant, is

13 concerned if his attorney finds out, his alleged criminal

14 cohorts will find out and he may be -- he and his family may

15 be in some physical danger.  We credit that concern.

16         We think there is a good faith basis for it and what

17 we're making a record about, and we'll of course abide by the

18 Court's guidance or direction, we intend to do what we've done

19 in the past with similarly situated individuals, that is we do

20 intend to meet with him to

21         A, in a very limited way, to do two things:  One, to

22 confirm what the agents have told us he already said, which

23 he's afraid of talking to the government regarding

24 cooperation, and Mr. Washor Finding out.  If that is true, and

25 if he wants to negotiate with the government regarding

6

1  cooperating, we will tell him we can't deal with him in this

2  regard, but we can assist him in obtaining counsel, who he can

3  trust, to represent his interests in dealing with the

4  government.

5         We don't purport to negotiate with him, we don't

6  purport to debrief him.  But at this stage it's our judgment,

7  based on past experience, that if, for example, counsel were

8  to be appointed for him or we were to tell him that he must

9  come before the Court now, we're not certain that he will.

10 Because of the distrust of us and a distrust of the process

11 and because we're not exactly sure if cooperation is exactly

12 what he wants.

13        In any event, your Honor we would like to -- we

14 intend to, notwithstanding our recognition of our ethical

15 obligations, and of the Sixth Amendment, we think that this is

16 the type of instance in which it simply can't be the case--

17        We respectfully submit, it can't be the case that the

18 limited type of contact that we intend to have is precluded by

19 7104 or by Messiah and its subsequent cases, because this

20 is one of those instances, which there is, I think, and we

21 submit ample reason to believe that there is a need for

22 contact from the prospective of the arrested defendant.  There

23 is a need for this limited contact in the absence of his

24 counsel's knowledge, if he were to fire his counsel now that

25 would send the same sort of signal sharing with counsel his

7

1  desire to -- his potential desire to cooperate would have and

2  we thought we'd make a record of that, because we recognize

3  that this is very delegate -- a very delegate issue,

4  implicating both ethical and legal concerns.

5          This is the way we have handled it in the past.  We

6  think it's the correct way to go.  Of course, if the Court

7  directs us not to, we won't do it.  We nevertheless thought i

8  was appropriate before we did it to make the record and there

9  is one other thing.



22          We have advised Agent Favo that in the future, as h

23  brother agent did, when he hears from Sporacco to call us

24  before doing anything.  We told him it's both imprudent and

25  potentially in violation of the person's rights and

1  potentially could cause an ethical problem for Mr.

2  Stamboulidis and I.  He understands that.  He'll not do it in

3  the future, but I thought it was appropriate, while we're

4  here, to make a record of that contact.

5        Finally, this is just by way of information to the

6  Court.  Carmine Sessa, who is an indicted defendant, is

7  represented by counsel.  We expect, if the Court is around

8  tomorrow, we expect to request the Court, provided we can have

9  the agreement executed and an information drafted, we expect

10  to ask the Court to entertain his request to enter a plea of

11  guilty tomorrow before he's taken away to another detention

12  facility.  That is not part of our application now.

13        THE COURT:  With respect to the second part, I hadn't

14  planned to come in tomorrow, but I can certainly if it will

15  convenience the government or take it later today.  Whatever

16  you want.

17        MR. GLEESON:  If we could contact chambers and see if

18  we get the lawyer, the agreement and the information.

19        THE COURT:  I'll do whatever I can to assist the

20  government.

21        MR. GLEESON:  Thank you.

22        THE COURT:  With respect to the main point I think

23  you've operated properly.

24        You say he reached out.  What do you mean "he reached

25  out"?  How did he reach out?

1          MR. GLEESON:  My understanding, he made a telephone
2    call from his home to the FBI offices.
3          THE COURT:  And said what?
4          MR. GLEESON:  Would you like us to bring the agent
5    in?
6          THE COURT:  Bring the agent in.  (Agents present.)
7          THE COURT:  Good morning, gentlemen.
8          Why don't you sit down and make yourself
9    comfortable.  Would you rise, please
10   C H R I S T O P H E R   M.   F A V O,
11   M I C H A E L  D.  J E N K I N S
12        having been first duly sworn, was examined
13        and testified as follows:
14          AGENT FAVO:  Christopher M. Favo.
15          AGENT JENKINS:  Michael D. Jenkins.
16          THE COURT:  Would you like to make a brief breach
17   record in answer to the question I posed?
18          MR. GLEESON:  The Court inquired as to the nature of
19   the contact.  I've informed the Court of the contact that was
20   made by Frank Sporacco to the FBI, and also I have given a
21   description of the contact made yesterday with ███████
22          With respect to our intention to speak to Frank
23   Sporacco, the Court inquired of the nature of the
24   communication from Sporacco to the FBI that caused us to want
25   to speak to him.

1          MR. JENKINS:  I believe that would best be addressed

2    by me.

3          MR. GLEESON:  How did he contact you.

4          AGENT JENKINS:  Telephone.

5          MR. GLEESON:  When was this.

6          AGENT JENKINS:  Yes, the day before and the latest

7    contact was early this morning.

8          THE COURT:  He called you.

9          AGENT JENKINS:  Yes, your Honor.  Called me and on

10   one occasion beeped me and I returned the call.

11         THE COURT:  Give me the conversation, what he said,

12   what you said beginning with the first.

13         AGENT JENKINS:  To paraphrase or give you the gist of

14   the conversation, your Honor, Mr. Sporacco was interested in

15   speaking with me --

16         THE COURT:  What did he say to you, how did he open

17   the conversation.

18         AGENT JENKINS:  When are you going to be able to see

19   me and explain to me what is going on and that I might be able

20   to ask you some questions about my alternatives.  He's

21   interested--

22         THE COURT:  That was the first?

23         AGENT JENKINS:  Yes, your Honor.

24         THE COURT:  That was what the first occasion he

25   called you?

1          AGENT JENKINS:  Yes.

2          THE COURT:  What did you answer?

3          AGENT JENKINS:  I told him that I would try to set up

4    a time and find out a time when myself, Agent Favo, and my

5    supervisor William DeVeccio could come to see him.

6          THE COURT:  Was that the gist of the first

7    conversation?

8          AGENT JENKINS:  Yes, your Honor.

9          THE COURT:  The second conversation, he called you

10   again?

11         AGENT JENKINS:  I don't recall if I called him at his

12   residence or he called me, your Honor.

13         THE COURT:  What was said at that time?

14         AGENT JENKINS:  I told him that we're planning on

15   having a meeting that day sometime, what was a good time for

16   him?  That was yesterday.

17         THE COURT:  What did he say?

18         AGENT JENKINS:  He said he would try to find out when

19   his wife would not be present and let me know.

20         THE COURT:  What was the third conversation?

21         AGENT JENKINS:  Well in the meantime, your Honor, I

22   had become concerned about the Sixth Amendment consideration

23   that we're here to address, so I called him back and told him

24   it's a problem, I'm going to have to talk to the attorneys,

25   perhaps the judge, and get back with you.  That was before

HENRY SHAPIRO          OFFICIAL COURT REPORTER

12

1  lunchtime.  He beeped me, around one o'clock yesterday, and I

2  told him that we're going to have a hearing, such as this, and

3  asked him if he would call me this morning to find out what

4  the status of it was.  That's the second contact which really

5  consisted of two or three contacts yesterday.

6      THE COURT:  Well, did he mention at any point that he

7  didn't want his lawyer to know about this?

8      AGENT JENKINS:  Yes, your Honor.  In fact I

9  specifically asked him that.

10      THE COURT:  What conversation was that?

11      AGENT JENKINS:  That would have been the first

12  conversation yesterday, I believe, your Honor.

13      In any event it was yesterday.

14      THE COURT:  Tell me what was said.

15      AGENT JENKINS:  At that point I was aware that his

16  wife and/or other persons were present in the room where he

17  was talking, because I could hear background noise and I said,

18  I know that it's probably hard to talk, but one of the things

19  that I'm concerned about is the fact that you have a lawyer

20  and any contact that I have with you to discuss the charges

21  pending against you should be with the knowledge of your

22  lawyer.

23      I was in fact already aware at that time, your Honor,

24  that he would not want his lawyer to know and I asked him that

25  because I knew he was unable to talk.

HENRY SHAPIRO          OFFICIAL COURT REPORTER

13

1          Do you want your lawyer to know, you don't, do you?

2    No, I don't.  You can't talk openly now, can you?  No, I

3    can't.

4          I said, if you have any misunderstanding of what is

5    going on or you want to get together to talk about this some

6    other way, please let me know.  I know you can't talk freely.

7    He said, no, I understand.  If your lawyer is aware of such a

8    meeting, will that put you in partial jeopardy?  Yes, sir, it

9    will.  And that was --

10         THE COURT:  You just stated a moment ago, you had

11   already known when you had this conversation that he didn't

12   want his lawyer to be present.  How did you no that?

13         AGENT JENKINS:  I suppose I didn't know it

14   specifically as to the circumstances, your Honor, but as a

15   general principle usually these people, these L C N people,

16   the lawyers represent more or less the whole family and not

17   just one individual, and we're concerned about anything that

18   the lawyer has knowledge of, perhaps the whole family has

19   knowledge of.

20         THE COURT:  I understand.

21         I think I'd better talk to the lawyers.  I don't

22   think I need you both here at the moment unless there is

23   something else that you want to put on the record?

24         MR. GLEESON:  No, your Honor.

25         THE COURT:  Just wait outside, please.  Thank you

1  very much.

2         (Agents leave chambers).

3         THE COURT:  Based on that testimony some lawyer

4  would, I think, have some justification arguing the

5  prospective witness was led into saying he didn't want to see

6  a lawyer.  See United States with a Lawyer present.

7         I think that is the way it could be read, whether

8  accurately or not.

9         May I make this suggestion, for you to consider.  And

10 maybe it's a way to deal with some of these problems.  Ask him

11 to come in, if that is what he wants to do, would he come in

12 physically --

13        MR. STAMBOULIDIS:  There is one problem.  He's on an

14 electrically monitored bracelet.  That is part of his home

15 detention.  We'd need court approval to turn that off.

16        THE COURT:  I'll give you that.

17        MR. STAMBOULIDIS:  For a limited time to have him

18 come to the Court.

19        THE COURT:  You can transmit that to the head of

20 probation.  You don't have to give them any reasons, just say

21 that no one is to know about it, however, they accomplish it

22 and have it accomplished.  I think we can do that.

23        MR. STAMBOULIDIS:  Judge, there is only one other

24 operational barrier that might be in this person's mind, but

25 I'll be happy to abide by whatever suggestion the Court thinks

15

1  appropriate



7       It may be a problem that is solely his.

8       THE COURT:  Have a probation officer go out and bring

9  him in for further information required in connection with

10  this program.  I think that is the easiest way to do it.  You

11  don't have to turn off anything, just have the chief of

12  Probation Services accomplish that.  He's to be brought in to

13  give further information necessary for this program to have

14  everything checked, whether the bracelet, use whatever excuse

15  you wish.

16       I think then the best thing to do is to go before a

17  judge or a magistrate judge, in the first instance when he's

18  brought in, before he's involved in a conversation, and have

19  the magistrate judge put it to him on the record and you make

20  a firm record in an official way and there is no question

21  about it.

22       If he says that is what he wants, he goes down with

23  you and continues the discussion.  If he says he doesn't want

24  it, he goes home.

25       MR. GLEESON:  Very well.

HENRY SHAPIRO        OFFICIAL COURT REPORTER

16

1      THE COURT:  If you think that is appropriate.

2      MR. GLEESON:  We think that is fine.

3      THE COURT:  Get up an order.  Get the whole thing

4  drawn and I'll sign it and seal it.

5      MR. GLEESON:  Can we confer with the agents about the

6  best scenario?

7      THE COURT:  Use your own judgment.

8      MR. GLEESON:  Maybe we'll bring him in on the ruse

9  it's a joint attorney-client meeting or something like that.

10      THE COURT:  Do it anyway you wish.

11      MR. GLEESON:  Very well.

12      THE COURT:  You have my authority to go to the head

13  of probation.

14      MR. GLEESON:  Do you want to see this witness?

15      THE COURT:  You can bring him before me or the

16  magistrate judge.  Who do you want to bring him before?

17      MR. GLEESON:  We have no particular reference.

18      THE COURT:  I'd rather have a magistrate judge see

19  him, because if I'm going to have anything to do with the

20  trial, the less I have to do with contact with witnesses the

21  better.

22      MR. GLEESON:  That makes sense.

23      MR. STAMBOULIDIS:  Thank you.

24      MR. GLEESON:  Thank you. .

25      THE COURT;  Seal the record.

••••

HENRY SHAPIRO        OFFICIAL COURT REPORTER