UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

ANGELA CLEMENTE,

     Plaintiff,

          v.

FEDERAL BUREAU OF INVESTIGATION *et al.*

     Defendants.

Civil Action No. 1:20-cv-01527

---

## DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), Federal Bureau of Investigation ("FBI"), Winchester, Virginia. I joined the FBI in September 2011, and prior to my current position, I was the Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of the General Counsel, Freedom of Information Act ("FOIA") Litigation Unit, from September 2011 to November 2012. In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act ("FOIPA") litigation cases nationwide. Prior to my joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration ("DEA") from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits nationwide. I also served as a U.S. Army Judge Advocate General's Corps Officer in various assignments from 1994 to September 2006 culminating in my assignment as

1

Chief, General Litigation Branch, U.S. Army Litigation Division where I oversaw FOIPA

litigation for the U.S. Army.  I am an attorney licensed in the State of Ohio and the District of

Columbia.

(2)      In my official capacity as Section Chief of RIDS, I supervise approximately 242

employees, supported by approximately 89 contractors, who staff a total of ten (10) FBI

Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective

mission is to effectively plan, develop, direct, and manage responses to requests for access to

FBI records and information pursuant to the FOIA, as amended by the OPEN Government Act of

2007; the OPEN FOIA Act of 2009; the FOIA Improvement Act of 2016; the Privacy Act of

1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures;

judicial decisions; and other Presidential and Congressional directives.  My responsibilities also

include the review of FBI information for classification purposes as mandated by Executive

Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010), and the preparation of declarations in support of

Exemption 1 claims asserted by the FBI under the FOIA.  I have been designated by the Attorney

General of the United States as an original classification authority and a declassification

authority pursuant to E.O. 13526, §§ 1.3 and 3.1, respectively.  The statements contained in this

declaration are based upon my personal knowledge, information provided to me in my official

capacity, and conclusions and determinations reached and made in accordance therewith.

(3)      Because of the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the

provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a.

Specifically, I am aware of the FBI's handling of Plaintiff Angela Clemente's ("Plaintiff") FOIA

request for records related to the FBI's investigation of Jeffrey Edward Epstein, any alleged

2

informant file records pertaining to the same individual, and specific records of third-party

associates or recruiters for Jeffrey Epstein, to include records pertaining to the victims of the

crimes associated with Jeffrey Epstein in multiple jurisdictions.

(4)    The FBI submits this declaration in support of Defendants' Motion for Summary

Judgment ("MSJ"). Part I of this declaration provides a summary of the administrative history of

Plaintiff's request. Part II explains the procedures used to search for, review, and process

responsive records. Part III, in accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973),

provides the FBI's justification for withholding information in part or in full pursuant to FOIA

Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(5), (b)(6),

(b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E). Part IV explains the FBI's procedures for

reviewing records categorically exempt pursuant to FOIA Exemption 7(A).  Additionally, in the

event the enforcement proceedings underlying the FBI's assertion of FOIA Exemption 7(A) end

during the pendency of this FOIA litigation or if the Court denies the FBI's Exemption 7(A)

categorical denial, the FBI asserts underlying FOIA exemptions that apply to these records, as

described herein. Part V provides the FBI's justification of the FOIA exemptions asserted to

withhold information from disclosure.  Part VI provides justification for neither confirming nor

denying the existence of certain records pursuant to FOIA Exemptions (b)(6), (b)(7)(C), and

(b)(7)(D).

(5)    As discussed in ¶ 29, *infra*, the FBI previously processed (in response to a prior

FOIA request) a total of 11,571 pages of Bates-numbered Vault records that are also responsive

to Plaintiff's request:  181 pages were released in full ("RIF"), 1,051 pages were released in part

("RIP"), and 10,339 pages were withheld in full ("WIF").  Additionally, as discussed in ¶ 31,

*infra*, the FBI processed a total of 1,505 pages of other Bates-numbered records responsive to

Plaintiff's request: 666 pages were RIF, 742 pages were RIP, and 97 pages were WIF. The

FBI's justification for withholding information in part and in full pursuant to FOIA Exemptions

1, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552(b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(A),

(b)(7)(C), (b)(7)(D), and (b)(7)(E), is discussed below.

### PART I: ADMINISTRATIVE HISTORY OF PLAINTIFF'S REQUEST

(6)    By letter dated January 22, 2020, Plaintiff submitted a FOIA request to the FBI

seeking the following:

> "copies of any informant files, records or materials on or pertaining to Jeffrey
> Epstein, including but not limited to any informant file or Top Echelon (TE)
> informant file, Confidential Human Source (CHS) Reporting documents, and any
> Federal Central Inmate Monitoring System (CIMS) records wherever they may be
> located or filed and in whatever form or format they may be maintained;
> photographic copies of all photographs of Mr. Epstein; [w]ith respect to electronic
> surveillance materials, provide not only the transcripts, logs, and other written
> materials pertaining thereto, but also any audio or videotapes in the format in
> which they were recorded; copies of any agreements with Epstein, or draft copy,
> or proffer agreement with Epstein and the FBI; correspondence, memoranda,
> documents, reports, records, statements, audits, lists of names, applications,
> diskettes, flash drives, letters, expense logs, and receipts, calendar or diary logs,
> facsimile logs, flight logs, telephone records, call sheets, tape recordings,
> video/movie recordings, notes, ticklers, numbered and lettered subfiles, 1A
> envelopes, enclosures behind files, (EBF's), file covers, bulky exhibits
> ('Bulkies'), control files, and 'JUNE' or 'JUNE MAIL' files or records,
> examinations, opinions, folders, files, books, manuals, magazines, main discs, any
> mini storage files and records including and relating to mini storage 989-9779,
> and any records in file number storage unit files and records, archival storage unit
> files and records, pamphlets, forms, closed or transferred subfiles, jottings,
> telephone messages, message slips, post it notes or sticky's, drawings, charts,
> photographs, electronic mail, and other documents and records or materials that
> refer or relate to Epstein and/or the 7 categories below in any way...."

1.    "All warrants or drafts of warrants based in whole or in part on information
submitted or provided by Mr. Epstein, including all information submitted by
Epstein which was used to support warrants or drafts of warrants based on
information provided by him;"

2.    "Any and all information related to Mr. Epstein in which the FBI identified an
associate of Mr. Epstein's criminal activities or his criminal enterprise. Please
include those records where identification was made of a **victim** or an **associate or**

**recruiter of Mr. Epstein's** that **left from, or were taken to,** ANY locations in Kentucky, New Jersey, Ohio, or Palm Beach, Florida. Please also include records identifying what geographical areas the victims, criminal targets, or Epstein's associates were from, such as the counties, cities, towns, suburbs, and any unincorporated communities' name. Please also identify and release all records in the files that mention criminal targets or associates of Epstein that held positions in public office or were identified as attorneys or judges located in the state of Ohio;" (emphasis in the original).

3.   "All records pertaining to or referencing Portsmouth, Ohio Attorney Michael Mearan. Also include records pertaining to or referencing William Marshall or Mark Eubanks;"

4.   "All records in any informer file in chronological sequence, commencing with the present year 2020 through to the earliest date;"

5.   "All records that has FBI employee Angela L. Byers name, or codename, or signature, or initials on them pertaining to any Epstein investigation related to Ohio or mentioning Ohio, New York, New Jersey, or Palm Beach, Florida;"

6.   "All records pertaining to Epstein victims associated in any way with Ohio or pertaining to Ohio, Kentucky or New Jersey that were taken to Palm Beach, Florida or were brought from Palm Beach, Florida to other states or countries including which state or countries the victims were brought to by Epstein or his associates; and"

7.   "All records pertaining to any FBI internal investigations related to Epstein, or Epstein and Ohio, whether located in the FBI Inspection Division (FBI-INSD), National and Transnational Organized Crime section, Office of Professional Responsibility, Public Corruption Division, Units, or Offices, Violent Crime Divisions, FBI Cincinnati Field Division (White Slave Trafficking investigation) FBI Cincinnati Field Division Human trafficking investigations, FBI Detroit Field Division Extortion Investigation, FBI Cincinnati Field Division Mexican Drug Trafficking Organization investigation files, FBI Cincinnati Field Division Violent Gang investigation or DEA Cincinnati Resident Office Investigation referrals to the FBI; and also FBI civil litigation division files or records of any kind whatsoever, and Counter-Intelligence Sections."

Additionally, Plaintiff requested to be notified after her 500-page requested limit had been reached and "other informant materials remain." Plaintiff agreed to pay fees up to $50.00 and requested to be notified if the fees exceeded that amount, while also requesting a full fee waiver based on public interest under 5 U.S.C. § 552(a)(4)(A)(iii), and based on Plaintiff's belief that the "materials [she sought] will shed significant light on government operations and activities

with informant practices." **(Ex. A.)**

(7)    By letter dated January 31, 2020, the FBI acknowledged receipt of Plaintiff's

FOIA request, and notified Plaintiff it had assigned her request FBI FOIPA Request Number

1458180-000.  The FBI advised Plaintiff that some of the records responsive to her request are

available in the FBI's electronic FOIA Library ("Vault") and can be located using the search

term "Jeffrey Epstein."  Also, the FBI advised Plaintiff that additional responsive material is

located in an investigative file exempt from disclosure pursuant to 5 U.S.C § 552(b)(7)(A),

which exempts from disclosure "records or information compiled for law enforcement purposes,

but only to the extent that the production of such law enforcement records or information (A)

could reasonably be expected to interfere with enforcement proceedings."  Additionally, the FBI

informed Plaintiff that, because she requested information on one or more third-party

individuals, the FBI would neither confirm nor deny the existence of such records pursuant to

FOIA Exemptions 6 and 7(C), 5 U.S.C. §§ 552(b)(6) and (b)(7)(C).  The FBI explained that the

mere acknowledgement of the existence of FBI records on third-party individuals could

reasonably be expected to constitute an unwarranted invasion of their personal privacy.  In

addition, the FBI advised Plaintiff that in response to her request for CHS records, the FBI would

neither confirm nor deny the existence of such records pursuant to FOIA Exemption (b)(7)(D).

Also, the FBI advised Plaintiff that it had rerouted portions of her request to the Department of

Justice ("DOJ") and provided Plaintiff with a copy of the FBI's FOIPA Addendum.[1]  This

---

[1] The FOIPA Addendum serves multiple purposes.  First, the FOIPA Addendum explains that a
Central Records System ("CRS") search encompasses the applicant, investigative, intelligence,
personnel, administrative, and general files of the entire FBI, including FBI Headquarters
("FBIHQ"), FBI field offices, and FBI legal attaché offices ("legat") worldwide, and the FBI's
electronic surveillance ("ELSUR") records.  The FOIPA Addendum provides an explanation of
the FBI's standard CRS search policy, advising that, unless specifically requested, a standard
search does not include a search for reference entity records, administrative records of previous

addendum, supplied in response to all FOIPA requests, advises requesters of the FBI's standard

*Glomar* assertions taken with respect to certain types of records and provides general

information concerning FBI records, searches, and programs.[2]  Finally, the FBI informed

Plaintiff that she could appeal the FBI's response determinations to the DOJ, Office of

Information Policy ("OIP"), within ninety (90) days of the date of its letter, contact the FBI's

FOIA public liaison, or seek dispute resolution services by contacting the Office of Government

Information Services ("OGIS").  **(Ex. B.)**

       (8)     By letter dated April 30, 2020, Plaintiff submitted an appeal to OIP challenging

the FBI's determinations concerning FOIPA Request Number 1458180-000.  **(Ex. C.)**

       (9)     By letter dated May 12, 2020, OIP acknowledged receipt of Plaintiff's appeal and

informed Plaintiff that OIP assigned appeal number A-2020-00991 to her appeal.  **(Ex. D.)**

       (10)   Plaintiff filed the complaint in this case on June 10, 2020.  *See* ECF No. 1.

       (11)   By letter dated August 25, 2020, OIP informed Plaintiff that it was closing

---

FOIPA requests, or civil litigation files.  Second, the FOIPA Addendum informs requesters that
the FBI considers the foreseeable harm standard in the processing of FOIA requests.  Third, the
FOIPA Addendum advises requesters that requests for criminal histories, i.e., "rap sheets,"
should be directed to the FBI's Criminal Justice Information Services Division.  Fourth, the
FOIPA Addendum informs requesters that because of the FBI's law enforcement and national
security functions, FBI FOIPA responses are limited to those records subject to the requirements
of the FOIPA.  Fifth, the FBI FOIPA Addendum explains that to the extent a request seeks
intelligence records, the FBI can neither confirm nor deny the existence of records of intelligence
sources, methods, or activities pursuant to FOIA Exemptions 1 and 3 [50 U.S.C. § 3024(i)(1)].
Finally, the FBI FOIPA Addendum advises that, if a request seeks records on an individual, the
FBI can neither confirm nor deny the existence of the following three categories of information:
(1) any individual's name on a watchlist pursuant to Exemption 7(E); (2) records that could
identify any participant in the Witness Security Program, pursuant to Exemption 3 (18 U.S.C. §
3521); and (3) records that could reasonably be expected to endanger the life or physical safety
of a CHS, pursuant to Exemptions 7(D), 7(E), and 7(F).  These standard responses apply to all
requests.
[2] Plaintiff was provided the FBI's FOIPA Addendum in each FBI release letter.  *See* Exhibits F-
R.  For conciseness, this language is not repeated here.

Plaintiff's appeal number A-2020-00991, because of Plaintiff's pending litigation concerning

FOIPA Request Number 1458180. **(Ex. E.)**

(12)    By letter dated December 9, 2020,[3] the FBI made its first interim release of

records responsive to Plaintiff's request, advising that it reviewed 93 pages of records and

released 84 pages of records in full or in part, with certain information withheld pursuant to

FOIA Exemptions 3, 6, 7(A), 7(C), 7(D), and 7(E).  The FBI advised that documents were

located which originated with, or contain information concerning, another government agency

("OGA").  The FBI further advised Plaintiff that it had sent those documents to the OGA for

consultation and would correspond with Plaintiff upon completion of the consultation.

Additionally, Plaintiff was advised that her request for a public interest waiver for records

surrounding the investigation and conviction of Jeffrey Epstein for sex trafficking of minors and

conspiracy to commit sex trafficking of minors was granted.  The public interest fee waiver for

any other records on Jeffrey Epstein not related to the aforementioned investigation and

conviction was denied because Plaintiff did not provide sufficient reasons to support a finding of

public benefit.[4]  The FBI further advised Plaintiff that additional information responsive to her

request was located in an investigative file exempt from disclosure in its entirety pursuant to 5

U.S.C. § 552(b)(7)(A), which pertains to records and information compiled for law enforcement

purposes, the release of which could reasonably be expected to interfere with enforcement

proceedings.  Finally, the FBI advised that although her request is in litigation, Plaintiff could

---

[3] The FBI previously sent a letter to Plaintiff, dated November 23, 2020, along with a copy of the
records provided in the December 9, 2020, release.  However, the FBI had not applied Bates
numbers to the pages and had not addressed Plaintiff's fee waiver request.  The FBI issued the
December 9, 2020, letter to replace the November 23, 2020, letter.
[4] Plaintiff was advised of the determination of her fee waiver in each FBI release letter.  *See*
Exhibits G-Q.  For conciseness, this language is not repeated here.

appeal the FBI's response determinations to OIP within ninety (90) days of the date of its letter,

contact the FBI's FOIA public liaison, or seek dispute resolution services by contacting OGIS.[5]

**(Ex. F.)**

(13)    By letter dated December 22, 2020, the FBI made its second interim response to

Plaintiff, advising that it had reviewed information located in an investigative file exempt from

disclosure pursuant to FOIA Exemption (b)(7)(A), and asserted underlying Exemptions 3, 5, 6,

7(C), 7(D), and 7(E) to the information. Additionally, the FBI advised that RIDS is operating at

reduced staffing levels amidst the ongoing COVID-19 national emergency, and the work product

reviewed for this interim release was what could be generated under the unprecedented

circumstances.[6] **(Ex. G.)**

(14)    By letter dated January 22, 2021, the FBI made its third interim response to

Plaintiff, advising that it had reviewed information located in an investigative file exempt from

disclosure pursuant to FOIA Exemption (b)(7)(A), and asserted underlying Exemptions 3, 6,

7(C), 7(D), and 7(E) to the information.  **(Ex. H.)**

(15)    By letter dated February 22, 2021, the FBI made its fourth interim response to

Plaintiff, advising that it had reviewed information located in an investigative file exempt from

disclosure pursuant to FOIA Exemption (b)(7)(A), and asserted underlying Exemptions 3, 6,

7(C), 7(D), and 7(E) to the information.  **(Ex. I.)**

---

[5] Plaintiff was advised in each FBI release letter, see Exhibits G-R, about Plaintiff's appeal rights and that, although the request is in litigation, Plaintiff could appeal the FBI's response determinations to OIP within ninety (90) days of the date of its letter, contact the FBI's FOIA public liaison, or seek dispute resolution services by contacting OGIS.  For conciseness, this language is not repeated.

[6] Plaintiff was advised in certain FBI release letters, *see* Exhibits H-K, that RIDS was operating at reduced staffing levels amidst the ongoing COVID-19 national emergency, and the work product reviewed for the interim release was what could be generated under the unprecedented circumstances.  For conciseness, this language is not repeated.

(16)    By letter dated March 22, 2021, the FBI made its fifth interim response to Plaintiff, advising that it had reviewed information located in an investigative file exempt from disclosure pursuant to FOIA Exemption (b)(7)(A), and asserted underlying Exemptions 3, 6, 7(C), 7(D), and 7(E) to the information.  **(Ex. J.)**

(17)    By letter dated April 22, 2021, the FBI made its sixth interim response to Plaintiff, advising that it had reviewed information located in an investigative file exempt from disclosure pursuant to FOIA Exemption (b)(7)(A), and asserted underlying Exemptions 3, 6, 7(C), 7(D), and 7(E) to the information.  **(Ex. K.)**

(18)    By letter dated May 21, 2021, the FBI made its seventh interim response to Plaintiff, advising that it had reviewed information located in an investigative file exempt from disclosure pursuant to FOIA Exemption (b)(7)(A), and asserted underlying Exemptions 3, 6, 7(C), 7(D), and 7(E) to the information.  **(Ex. L.)**

(19)    By letter dated June 22, 2021, the FBI made its eighth interim response to Plaintiff, advising that it had reviewed information located in an investigative file exempt from disclosure pursuant to FOIA Exemption (b)(7)(A), and asserted underlying Exemptions 1, 3, 6, 7(C), and 7(E) to the information.  **(Ex. M.)**

(20)    By letter dated August 2, 2021, the FBI made its ninth interim response to Plaintiff, advising that it reviewed 502 pages and released 360 pages in full or in part, with certain information withheld pursuant to FOIA Exemptions 1, 3, 5, 6, 7(A), 7(C), and 7(E).[7]

---

[7] In its letter, the FBI inadvertently identified the reviewed page count as 502 and the released page count as 360.  The correct reviewed page count is 483 and the correct released page count is 365.  *See* Exhibit T (*Vaughn* index) for accurate page counts.  Because the responsive investigative file remained exempt pursuant to FOIA Exemption 7(A), the records processed for the ninth-twelfth releases contain other responsive records as described in ¶ 30, *infra*.

Duplicate copies of the same page were not processed. The FBI advised Plaintiff that documents were located which originated with, or contain information concerning, OGAs and that the FBI had sent the documents to the OGAs for consultation and would correspond with Plaintiff upon completion of the consultation. **(Ex. N.)**

(21) By letter dated August 23, 2021, the FBI made its tenth interim response to Plaintiff, advising that it reviewed 516 pages and released 451 pages in full or in part, with certain information withheld pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E); and that duplicate copies of the same page were not processed. The FBI advised Plaintiff that documents were located which originated with, or contain information concerning, OGAs, and that the FBI had sent the documents to the OGAs for consultation and would correspond with Plaintiff upon completion of the consultation. **(Ex. O.)**

(22) By letter dated September 22, 2021, the FBI made its eleventh interim response to Plaintiff, advising that it reviewed 426 pages and released 392 pages in full or in part, with certain information withheld pursuant to FOIA Exemptions 1, 5, 6, 7(A), 7(C), and 7(E)[8]; and that duplicate copies of the same page were not processed. The FBI advised that documents were located which originated with, or contain information concerning, OGAs, and that the FBI had sent the documents to the OGAs for consultation and would correspond with Plaintiff upon completion of the consultation. **(Ex. P.)**

_____

[8] In response to any FOIA request, the FBI sends pages containing OGA equities to the appropriate OGA for review. When a consultation response is returned from the OGA, the FBI annotates in the release letter that certain Bates-numbered pages have been returned and those final processed pages are enclosed in the release. The FBI typically does not count the returned consultation pages as part of its total reviewed pages in the letter to the FOIA requester. However, in this interim response, although the FBI advised Plaintiff that it had reviewed 426 pages, this page count included 13 pages of returned consults. The correct reviewed page count for this interim release should have been cited as 413. _See_ Exhibit T for accurate page counts.

(23)    By letter dated October 22, 2021, the FBI made its twelfth interim response to Plaintiff, advising that it reviewed 115 pages and released 112 pages in full or in part, with certain information withheld pursuant to FOIA Exemptions 5, 6, 7(A), 7(C), and 7(E)[9]; and duplicate copies of the same page were not processed.  The FBI advised that it had reviewed information located in an investigative file exempt from disclosure pursuant to FOIA Exemption (b)(7)(A).  The FBI advised that documents were located which originated with, or contain information concerning, OGAs, and that the FBI had sent the documents to the OGAs for consultation and would correspond with Plaintiff upon completion of the consultation.  **(Ex. Q.)**

(24)    By letter dated November 22, 2021, the FBI made its thirteenth, and final, interim response to Plaintiff, advising that it reviewed 15 pages and released 15 pages in full or in part, with certain information withheld pursuant to FOIA Exemptions 6, 7(A), and 7(C).[10] The FBI advised that it had reviewed information located in an investigative file exempt from disclosure pursuant to FOIA Exemption (b)(7)(A).  **(Ex. R.)**

(25)    By letter dated August 30, 2022, the FBI made a supplemental release of information on behalf of DOJ, Office of Information Policy ("OIP"), to Plaintiff.  **(Ex. Z.)**

(26)    By the same letter dated August 30, 2022, the FBI made a supplemental release of information on behalf of DOJ's Criminal Division ("CRM") to Plaintiff.  **(Ex. Z.)**

---

[9] The FBI inadvertently stated that 115 pages had been reviewed.  The FBI should have stated that it reviewed 0 pages and released 112 pages in full or in part out of 115 pages of returned consultations. *See* Exhibit T for accurate page counts.
[10] The FBI inadvertently stated that 15 pages had been reviewed.  The FBI should have stated that it reviewed 0 pages and released 15 pages in full or in part out of 15 pages of returned consultations. *See* Exhibit T for accurate page counts.

PART II: PROCEDURES USED TO SEARCH FOR, REVIEW, AND PROCESS
RESPONSIVE RECORDS

*The FBI's Reference to the "Vault" in Response to a Portion of Plaintiff's FOIA Request*

(27)    In response to a portion of Plaintiff's FOIA request, the FBI directed Plaintiff to

the FBI's electronic FOIA Library ("Vault"[11]) on the FBI's public website for records responsive

to Plaintiff's request concerning the Jeffrey Epstein investigation, because the FBI posted

records to the Vault in response to another FOIA request for the same records.  That FOIA

request is now in litigation (*Radar Online LLC et al. v. Federal Bureau of Investigation*, 17-cv-

03956 (S.D.N.Y.)) ("Radar Online").

(28)    The Vault-posted records comprise pages from the portion of the Epstein

investigation file created from the date of the FBI investigation into Jeffrey Epstein to the search

cut-off date of the Radar Online FOIA request, which was April 27, 2017.[12] The FBI processed

and posted the Vault records until Epstein was indicted and arrested.[13]  The indictment and arrest

resulted in the FBI not releasing additional records because to do so was reasonably anticipated

to cause harm to the ongoing enforcement proceedings.[14]  Therefore, the FBI properly asserted

---

[11] https://vault.fbi.gov/

[12] A search cut-off date is the date that the agency commences a search for records responsive to
a FOIA request.  Generally, the FBI uses a search cut-off date to delineate the scope of a FOIA
request by treating records created after that date as not responsive to the request. *See* 28 C.F.R.
§ 16.4(a).  DOJ provides notice of the use of a search cut-off date in its published FOIA
reference guide on its FOIA website (https://www.justice.gov/oip/doj-guide-freedom-
information-act-0).

[13] Jeffrey Epstein was arrested on July 6, 2019, on federal charges for the sex trafficking of
minors. *United States v. Epstein*, No. 19-cr-490 (S.D.N.Y.) (Dkt. No. 52).

[14] In response to the Radar Online FOIA litigation, the FBI reached out to the United States
Attorney's Office (USAO) in the Southern District of New York (SDNY), which confirmed that
additional releases of records responsive to the Radar Online FOIA request could negatively
impact the pending prosecution.  In response to Plaintiff's FOIA request, the FBI again reached
out to the USAO in the SDNY on May 16, 2021, which confirmed that any additional releases of
responsive investigation-related records could negatively impact the pending prosecution.

FOIA Exemption (b)(7)(A) to the remaining Radar Online records and to all previously processed withheld records. Even though Jeffrey Epstein died on August 10, 2019, while the federal charges were pending, the investigation continues of third-party individuals of investigative interest.

(29)    For the Vault records, the FBI processed a total of 11,571 pages. Of these pages, the FBI released in full 181 pages, released in part 1,051 pages, and withheld in full 10,339 pages. A *Vaughn* index **(Ex. S)** describes the 10,339 WIF pages exempt from disclosure pursuant to one or more applicable FOIA exemptions; duplicative of other pages accounted for elsewhere in the FBI's production; or sealed pursuant to United States Court order and thus unavailable for release through the FOIA. Exhibit S also describes the 1,051 RIP pages and the FOIA exemptions cited on those pages.

*Additional Responsive Records*

(30)    During discussions with Plaintiff, the FBI agreed to search for responsive FBI investigatory records pertaining to Jeffrey Epstein, but not pertaining to the sex trafficking and child prostitution investigation; to review previously processed records pertaining to Jeffrey Epstein, but not pertaining to the sex trafficking and child prostitution investigation for release of additional segregable information; and to search for and review records responsive to FOIA requests submitted by other requesters for release of segregable information pertaining to Jeffrey Epstein, but not pertaining to the sex trafficking and child prostitution investigation.

(31)    In response to the agreed upon search and subsequent review of records, the FBI processed a total of 1,505 pages of responsive records. Of these 1,505 processed pages, the FBI released 666 pages in full, released 742 pages in part, and withheld 97 pages in full. Of the 97 pages WIF, 53 pages are duplicates of other pages processed elsewhere in the production and 44

pages are exempt from disclosure pursuant to one or more FOIA exemptions. Information within released records and copies of the FBI's responses to FOIA requests from other requesters for the same subject matter were processed in response to Plaintiff's agreed-upon review of responsive records with non-segregable information withheld in part or in full pursuant to FOIA Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E). *See* Exhibit T (*Vaughn* index) (detailing the exemption withholdings for these records).

*Categorical Review*

(32)    As stated in certain interim response letters and in the final response letter that the FBI sent to Plaintiff, the FBI categorically denied release of certain records pertaining to the investigation of Jeffrey Epstein for sex trafficking and child prostitution pursuant to 5 U.S.C. § 552(b)(7)(A). Thus, in response to Plaintiff's request, the FBI conducted a two-part review of the categorically exempt records. First, the FBI reviewed the categorically exempt records denied to the Radar Online requester during the Vault processing to determine if those records remain exempt pursuant to FOIA Exemption 7(A) and to determine if any information could be released at this time. As stated above in footnote 14, the FBI contacted the USAO in SDNY, which confirmed that any additional release of responsive investigatory information could negatively impact pending prosecution.

(33)    Second, the FBI reviewed the categorically exempt records denied to Plaintiff, using the search cut-off date in Plaintiff's request, i.e., August 11, 2020, and determined that the identified records are categorically exempt pursuant to Exemption 7(A). In accordance with *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760 (D.C. Cir. 2000), the FBI assessed the records for underlying exemptions and determined such exemptions to be FOIA Exemptions 1, 3, 5, 6, 7(C), 7(D), and 7(E).

(34)    The FBI defends all its withholdings in detail below.

## THE FBI'S CENTRAL RECORDS SYSTEM

(35)    The Central Records System ("CRS") is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its mission and integrated functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions.  The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI field offices, and FBI legal attaché offices ("legats") worldwide.

(36)    The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories.  The broad array of CRS file classification categories includes types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters.  For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components: (a) the CRS file classification number; (b) the abbreviation of the FBI office of origin ("OO") initiating the file; and (c) the assigned individual case file number for the particular subject matter.[15]  Within each case file, pertinent documents of interest are "serialized," or assigned a document number in the order in which the document is added to the file, typically in chronological order.

---

[15] For example, in fictitious file number "11Z-HQ-56789," "11Z" indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789" indicates the assigned case specific file number.

## THE CRS GENERAL INDICES AND INDEXING

(37)    The general indices to the CRS are the index or "key" to locating records within

the enormous amount of information contained in the CRS.  The CRS is indexed in a manner

which meets the FBI's investigative needs and priorities and allows FBI personnel to reasonably

and adequately locate pertinent files in the performance of their law enforcement duties.  The

general indices are arranged in alphabetical order and comprise an index on a variety of subject

matters to include individuals, organizations, events, and other subjects of investigative interest

that are indexed for future retrieval.  The entries in the general indices fall into two categories:

    A.  <u>Main entry</u>.  A main index entry is created for each individual or non-individual
       that is the subject or focus of an investigation.  The main subject is identified in
       the case title of a file.

    B.  <u>Reference entry</u>.  A reference index entry is created for individuals or non-
       individuals associated with an investigation, but who are not the main subject or
       focus of an investigation.  Reference subjects are typically not identified in the
       case title of a file.

(38)    FBI employees may index information in the CRS by individual (person), by

organization (entity, place, and thing), and by event (e.g., terrorist attack or bank robbery).

Indexing information in the CRS is done at the discretion of FBI investigators when information

is deemed of sufficient significance to warrant indexing for future retrieval.   Accordingly, the

FBI does not index every individual name or other subject matter in the general indices.

### AUTOMATED CASE SUPPORT

(39)    Automated Case Support ("ACS") was an electronic, integrated case management

system that became effective for FBIHQ and all FBI field offices and legats on October 1, 1995.

As part of the ACS implementation process, over 105 million CRS records were converted from

automated systems previously utilized by the FBI into a single, consolidated case management

system accessible by all FBI offices.  ACS had an operational purpose and design to enable the

17

FBI to locate, retrieve, and maintain information in its files in the performance of its mission and myriad functions.[16]

### THE UNIVERSAL INDEX

(40)    The Universal Index ("UNI") was the automated index of the CRS searchable via ACS. It provided all offices of the FBI with a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching. Individual names were recorded with applicable identifying information, such as date of birth, race, sex, locality, social security number, address, and/or date of an event. ACS implementation built upon and incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompassed data that was already indexed into the prior automated systems superseded by ACS. As such, a UNI index search in ACS could locate FBI records created before its 1995 FBI-wide implementation.[17]

### SENTINEL

(41)    Sentinel is the FBI's next generation case management system that became effective FBI-wide on July 1, 2012. Sentinel provides a web-based interface to FBI users and includes the same automated applications that were utilized in ACS. After July 1, 2012, all FBI generated records are created electronically in case files via Sentinel. Just as pertinent

---

[16] ACS was, and the next generation Sentinel system is, relied upon by the FBI daily to fulfill essential functions, such as conducting criminal, counterterrorism, and national security investigations; background investigations; citizenship and employment queries; and security screening, to include presidential protection.

[17] Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by an automated review of index cards, known as the "manual indices." A search of the manual indices is triggered for requests on individuals if the person was born on or before January 1, 1958, and for requests seeking information about organizations formed or events occurring on or before January 1, 1973. Records created after these dates would be captured through an automated index search.

information was indexed into UNI for records generated in ACS before July 1, 2012, when a record is generated in Sentinel, information is indexed for future retrieval.

(42)    On August 1, 2018, ACS was decommissioned and ACS data was migrated into Sentinel including the ACS indices data and digitized investigative records formerly available in ACS. Sentinel retains the index search methodology and function whereby the CRS is queried, now via Sentinel, for pertinent indexed main or reference entries in case files. However, Sentinel did not replace ACS as an important FBI search mechanism. All CRS index data from the UNI application previously searched via ACS is now searched through the "ACS Search" function within Sentinel.

(43)    Upon receipt of FOIPA requests where the subject matter predates the implementation of Sentinel, the FBI, via RIDS, generally begins its FOIPA searching efforts by conducting index searches via the "ACS Search" function in Sentinel. The FBI then builds on the ACS index search by conducting an index search of Sentinel records to ensure it captures all relevant data indexed after the implementation of Sentinel. Conducting a search of the CRS automated indices, available within Sentinel, and via the ACS search function in Sentinel, in most cases, represents the most reasonable means for the FBI to locate records potentially responsive to FOIPA requests. This is because the automated indices provide access to a comprehensive, agency-wide set of indexed data on a wide variety of investigative and administrative subjects. Currently, the automated indices consist of millions of searchable records and are updated daily with material newly indexed in Sentinel.

(44)    The identification of records indexed to the subject of a FOIPA request does not automatically mean the indexed records are responsive to the subject. Index searches are the means by which potentially responsive records are located, but ultimately, a FOIPA analyst must

consider potentially responsive indexed records against the specific parameters of individual

requests. Responsiveness determinations are made once indexed records are gathered, analyzed,

and sorted by FOIPA analysts who then make informed scoping decisions to determine the total

pool of records responsive to an individual request.

*Electronic Surveillance Indices*

(45)    The electronic surveillance ("ELSUR") indices comprise records related to

electronic surveillance sought, administered, and conducted by the FBI since January 1, 1960.[18]

The ELSUR indices include records of: (a) targeted individuals and entities of electronic

surveillance pursuant to court order, consensual monitoring, or other authority; (b) owners,

lessors, or licensors of premises where the FBI conducted surveillance; and (c) individuals

identified as participants of monitored and recorded communications.

(46)    Since January 1, 1960, FBI field offices include in their ELSUR indices — and

report to FBIHQ for inclusion in its ELSUR index — the names of all persons whose

communications have been monitored through wire, oral, or electronic surveillance. On or about

October 9, 1991, the ELSUR indices were automated FBI-wide,[19] and since that time, FBIHQ

and all FBI field offices have access to the electronically generated and maintained ELSUR

records.

(47)    Similar to the consolidation of all indexed record data from prior automated CRS

systems superseded by ACS, the prior automated ELSUR indices also interfaced with ACS upon

its implementation in 1995. As a result, information in the ELSUR indices held in FBIHQ and

---

[18] *See* Privacy Act Systems of Records Notice JUSTICE/FBI-006, 70 Fed. Reg. 7513, 7515 (Feb. 14, 2005), *modified by*, 72 Fed. Reg. 3410 (Jan. 25, 2007).
[19] Prior to automation, the ELSUR indices consisted of index cards on individuals who had been the subject of surveillance by the FBI from 1960 to 1991.

FBI field offices since January 1, 1960, was indexed within, and is searchable by, the same UNI

application employed to locate CRS records.  ELSUR records created after July 1, 2012, are also

indexed and searchable within Sentinel.  While the ELSUR indices have a distinct legal identity

from the CRS as a different Privacy Act System of Records, in terms of function, information

from the ELSUR indices and the CRS indices is retrieved via an index search of the automated

indices in Sentinel.

## ADEQUACY OF SEARCH

(48)    Scope of Search and Results.  Prior to conducting a search of the CRS indices,

particularly in matters of heightened public interest, the FBI, via RIDS, typically conducts a

preliminary search of the FOIA Document Processing System ("FDPS") to determine if a subject

has been previously requested or is currently being processed in response to another FOIPA

request.  This helps to avoid duplication of efforts and is an efficient means of getting more

records to more requesters, while conserving RIDS limited resources.  As a result of the FDPS

search, the FBI located records responsive to Plaintiff's request in a first-party FOIPA request[20]

made on behalf of Jeffrey Epstein. The records located in response to this first-party request were

also located during the FBI's index search of the CRS in response to Plaintiff's request.[21]  To

ensure all responsive records were located by the CRS indices search, the FBI conducted a

search using the Radar Online request search cut-off date (April 27, 2017) and the search term

"Jeffrey Edward Epstein," but no additional responsive records were located (personal

identifiers, such as date of birth, locality of birth, and other identifiers pertaining to the sex

---

[20] The first-party FOIPA request sought records from main and cross-reference (also referred to as "reference") files from January 1, 2000, to November 25, 2012, on Jeffrey Epstein.

[21] The records responsive to the first-party Epstein FOIPA request are also responsive to the Radar Online request and, as previously stated, the records responsive to the Radar Online request posted to the Vault, are also responsive to Plaintiff's request.

trafficking and child prostitution investigation concerning Epstein were used to identify

responsive records). The FBI also conducted a search of the CRS indices using the search cut-

off date (August 11, 2020) from Plaintiff's request and the search term "Jeffrey Edward

Epstein." That search resulted in the identification of responsive records (personal identifiers,

such as date of birth, locality of birth, date of death [Plaintiff provided a death notice], and other

identifiers pertaining to the sex trafficking and child prostitution investigation concerning

Epstein were used to identify responsive records). As for Plaintiff's request for ELSUR records,

any responsive records located in the ELSUR indices would be duplicative of records located via

a search of the CRS indices (more specifically, a search of the Sentinel indices and ACS indices

available in Sentinel). Thus, searching the Sentinel indices and ACS indices available in Sentinel

accomplished the task of searching the ELSUR indices.

### PART III: JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

(49)    The FBI advised Plaintiff that the processed Vault records are responsive to her

request. In addition, the FBI processed non-7(A)-exempt records responsive to other FOIA

requests for Epstein-related records and non-7(A)-exempt records pertaining to Jeffrey Epstein,

but not pertaining to the sex trafficking and child prostitution investigation, to achieve maximum

disclosure consistent with the access provisions of the FOIA. Every effort was made to provide

Plaintiff with all information in the public domain and with all reasonably segregable, non-

exempt information. The FBI did not withhold any reasonably segregable, non-exempt

information from Plaintiff. Further description of the information withheld, beyond what is

provided in this declaration, could identify the actual exempt information withheld. The FBI

Bates-numbered all pages that it processed for the Vault (processed prior to July 2019),

consecutively as 03956-1 through 03956-11571. Attached to this declaration as Exhibit S is an

index of the Bates-numbered Vault records that have been withheld in full and in part, with an explanation of the basis for each withholding. The FBI Bates-numbered responsive, non-7(A) Epstein investigatory records, including records responsive to other FOIA requests for the same records, for Plaintiff's request, consecutively as FBI 20-cv-1527-1 through FBI 20-cv-1527-1505. On the pages released in full and in part, these numbers are typically located at the bottom of each page. Attached to this declaration as Exhibit T is an index of these Bates-numbered pages that have been withheld in full and in part with an explanation of the basis for each withholding.[22]

(50)    With respect to all the Bates-numbered records, the FBI further categorized its application of exemptions to provide additional detail regarding the nature of the information withheld. Specifically, the FBI applied numerical codes that coincide with various categories of exempt information. These coded categories are provided to aid the Court's and Plaintiff's review of the FBI's explanations of the FOIA exemptions asserted to withhold information. These codes, together with the information provided in this declaration, demonstrate that all information withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions, or is so intertwined with protected information that segregation is not possible without revealing the underlying protected information.

(51)    Each instance of information withheld pursuant to a FOIA exemption is accompanied by a coded designation that corresponds to one of the categories listed below. For example, if "(b)(7)(C)-1" appears on a document, "(b)(7)(C)" refers to FOIA Exemption 7(C)

---

[22] The total number of reviewed pages as stated in Plaintiff's response letters was incorrectly cited as 1,667. The total number of released pages as stated in the response letters was incorrectly cited as 1,414. *See* Exhibits F and N-R. As detailed in footnotes 7-10, above, the correct total number of reviewed pages is 1,505 and the correct total number of released pages is 1,408. *See* Exhibit T.

protecting against unwarranted invasion of personal privacy. The numerical designation "1"

following "(b)(7)(C)" narrows the main category into a more specific subcategory, such as

"Names and Other Identifying Information of Third Parties of Investigative Interest."

(52)    Listed below are the categories used to further explain the FOIA exemptions that

the FBI asserted to withhold information in the Vault records, in the other processed records

responsive to Plaintiff's FOIA request, or in both sets of records:

| SUMMARY OF EXEMPTION JUSTIFICATION CATEGORIES | |
| --- | --- |
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Exemption 1** | **Classified Information** |
| (b)(1)-1 | Information Properly Classified by an FBI Official Pursuant to E.O. 13526 (*Asserted in conjunction with Exemption 3*) |
| **Exemption 3** | **Information Protected by Statute** |
| (b)(3)-1 | Child Victims' and Child Witnesses' Rights Act - 18 U.S.C. § 3509 (*Asserted at times in conjunction with Exemptions 6, 7(C), and 7(D)*) |
| (b)(3)-2 | Federal Grand Jury Information – Federal Rule of Criminal Procedure 6(e) |
| (b)(3)-3 | Juvenile Justice and Delinquency Act - 18 U.S.C. § 5038 (*Asserted in conjunction with Exemptions 6 and 7(C)*) |
| (b)(3)-4 | National Security Act of 1947, as amended - 50 U.S.C. § 3024(i)(1) (*Asserted in conjunction with Exemption 1*) |
| **Exemption 5** | **Privileged Information** |
| (b)(5)-1 | Deliberative Process Privilege |
| (b)(5)-2 | Attorney Work Product Privilege |
| **Exemption 7(A)** | **Pending Enforcement Proceedings** |
| (b)(7)(A)-1 | Information Which, if Disclosed, Could Reasonably be Expected to Interfere with Pending Enforcement Proceedings |
| **Exemptions 6 & 7(C)** | **Clearly Unwarranted/Unwarranted Invasion of Personal Privacy** |
| (b)(6)-1 and (b)(7)(C)-1 | Names and Other Identifying Information of Third Parties of Investigative Interest |
| (b)(6)-2 and (b)(7)(C)-2 | Names and Other Identifying Information of FBI Special Agents and Professional Personnel, including Victim Specialists |
| (b)(6)-3 and (b)(7)(C)-3 | Names and Other Identifying Information of Third-Party Victims (*Asserted at times in conjunction with Exemptions 3 and 7(D)*) |
| (b)(6)-4 and (b)(7)(C)-4 | Names and Other Identifying Information of Local Law Enforcement Personnel |

| (b)(6)-5 and (b)(7)(C)-5 | Names and Other Identifying Information of Third Parties Merely Mentioned |
|---|---|
| (b)(6)-6 and (b)(7)(C)-6 | Names and Other Identifying Information of Non-FBI Federal Government Personnel |
| (b)(6)-7 and (b)(7)(C)-7 | Names and Other Identifying Information of State and Local Government Personnel (Non-Law Enforcement) |
| (b)(6)-8 and (b)(7)(C)-8 | Names and Other Identifying Information of Third Parties who Provided Information *(Asserted at times in conjunction with Exemption 7(D))* |
| **Exemption 7(D)** | **Confidential Source Information** |
| (b)(7)(D)-1 | Names and Other Identifying Information of Individuals and Information Provided by These Individuals Under an Implied Assurance of Confidentiality |
| (b)(7)(D)-2 | Names and Other Identifying Information of Individuals and Information Provided by These Individuals Under an Express Assurance of Confidentiality |
| (b)(7)(D)-3 | Information Provided by Foreign Government Agencies Under an Implied Assurance of Confidentiality |
| (b)(7)(D)-4 | Information Provided by Local Law Enforcement Agencies under an Implied Assurance of Confidentiality |
| **Exemption 7(E)[23]** | **Law Enforcement Techniques and Procedures** |
| (b)(7)(E)-1 | Collection Methods and Analysis of Investigative Information Obtained During Searches of Internal FBI Databases |
| (b)(7)(E)-3 | Sensitive File Numbers |
| (b)(7)(E)-4 | Types and Timing of Investigations |
| (b)(7)(E)-5 | Information Regarding Targets, Dates, and Scope of Surveillance |
| (b)(7)(E)-6 | Statistical Information Contained in Effectiveness Rating Form (FD-515) |
| (b)(7)(E)-7 | Database Identifiers and Printouts |
| (b)(7)(E)-9 | Monetary Payments and Funding for Investigative Purposes |
| (b)(7)(E)-11 & 14[24] | Internal FBI Secure Fax Numbers, FBI Non-published Internal Phone Numbers, FBI Email and IP Addresses, and FBI Intranet Addresses |
| (b)(7)(E)-12 | Investigative Focus of Specific Sensitive FBI Investigations |
| (b)(7)(E)-13 | Internal FBI Search Slips |

**EXEMPTION 7 THRESHOLD**

(53)    Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it

must first demonstrate that the records at issue were compiled for law enforcement purposes.

---

[23] Coded Exemption categories (b)(7)(E)-2, 8, and 10 were not utilized in the review of the Vault records or the other processed records responsive to Plaintiff's request.

[24] After further review of the records responsive to Plaintiff's request, the FBI determined that coded Exemption categories (b)(7)(E)-11 and 14 should be consolidated due to overlapping subject matter.

Pursuant to 28 U.S.C. §§ 533 and 534 and Executive Order 12333, as implemented by the

Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM), and 28 C.F.R. §

0.85, the FBI is the primary investigative agency of the federal government with authority and

responsibility to investigate all violations of federal law not exclusively assigned to another

agency, to conduct investigations and activities to protect the United States and its people from

terrorism and threats to the national security, and to further the foreign intelligence objectives of

the United States. Under this investigative authority, the responsive records herein were

compiled for the following specific law enforcement purposes.

(54)    The records at issue were compiled in furtherance of the FBI's investigation of

child prostitution and sex trafficking involving Jeffrey Epstein and other individuals of

investigative interest. On July 2, 2019, Jeffrey Epstein was indicted by a federal grand jury in

the United States District Court for the Southern District of New York on one count of

conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 371, and one count of sex

trafficking, in violation of 18 U.S.C. §§ 1591(a), (b)(2), and 2. *United States v. Epstein*, No. 19-

cr-490 (RMB) (S.D.N.Y.), Dkt. No. 2. Based on the indictment, Epstein was arrested by federal

authorities. Epstein died on August 10, 2019, at the Metropolitan Correctional Center, in New

York, while the federal charges were pending. Even with the death of Jeffrey Epstein, the

investigation continues as it includes other individuals of investigative interest. Considering

these records were compiled to document the FBI's investigation of potential federal crimes, the

FBI determined that they were compiled for law enforcement purposes, and readily meet the

threshold requirement of Exemption 7.

### PART IV: EXEMPTION 7(A) - PENDING ENFORCEMENT PROCEEDINGS

(55)    Exemption 7(A) exempts from disclosure "records or information compiled for

law enforcement purposes, but only to the extent that the production of such law enforcement records or information…could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

(56)    Application of this exemption requires: the existence of law enforcement records; a pending or prospective enforcement proceeding; and a determination that release of the information could reasonably be expected to interfere with the enforcement proceeding.

(57)    In this case, the FBI asserted Exemption 7(A) to withhold information regarding the ongoing investigation of Jeffrey Epstein and potentially others for sex trafficking and child prostitution, and to protect any pending or prospective prosecution of potential co-conspirators. *See* Exhs. S and T.  The FBI determined that release of any of the 7(A)-exempt records would provide criminals with information about the government's investigation and enforcement strategies in ongoing matters, allow them to predict and potentially thwart these strategies, and allow them to identify and tamper with witnesses or otherwise destroy evidence.  Because disclosing this information could reasonably be expected to interfere with pending or prospective enforcement proceedings, the FBI properly applied Exemption 7(A) to withhold it.  Additional information regarding the nature of criminal enforcement proceedings and the harms to those proceedings that could result from the disclosure of the 7(A)-exempt records is provided in the declaration of AUSA Maurene Comey.  *See* ECF No. 39, filed October 29, 2021, 1:17-cv-03956-PGG (SDNY).

*Types of Documents Categorically Denied Pursuant to FOIA Exemption 7(A)*

(58)    Providing a document-by-document description or listing of all the responsive records that have been properly categorically denied would undermine the very interests protected under Exemption (b)(7)(A).  In addition, in the event that the basis for asserting

Exemption 7(A) becomes moot during the pendency of this FOIA litigation, or if the Court

denies the FBI's categorical Exemption 7(A) assertion, then the FBI asserts the applicable

underlying FOIA exemptions detailed below.

(59)    Often, the FBI asserts Exemption 7(A) categorically to withhold different types of

documents found in an investigative file.  The Vault records and the other responsive records

from the pending investigative file consist of the following types of documents:

(a) Electronic Communications ("EC") (FD-1057[25]):  The EC replaced traditional FBI
correspondence vehicles (i.e., memoranda and letters) as the primary vehicle of
correspondence within the FBI.  The purpose of an EC is to communicate within the
FBI in a consistent format that can be uploaded by the originating Division or office,
transmitted, and downloaded by recipient Divisions or offices within the FBI's
internal computer network.  ECs are often utilized to document and disseminate
intelligence or investigative information and for general investigative and
administrative purposes.

(b) Interview Forms (FD-302):  FD-302s are internal FBI forms in which case-related
information is documented, usually as a result of an FBI interview.  Such information
may be used as evidence in court proceedings.  Additionally, these information in
these forms is often incorporated into other FBI documents that may be used to
disseminate intelligence or investigative information or to set leads.

(c) Handwritten Interview Notes:  These documents are the original handwritten notes of
FBI personnel who conducted interviews in FBI investigations.  These notes are
almost always transposed into an FD-302 and are utilized in the same manner as the
FD-302.

(d) State and Local Law Enforcement Agencies' Documents:  This category consists of
documents provided to the FBI by state and local law enforcement agencies.  These
documents can be used as evidence in court proceedings and contain information that
is often incorporated into other FBI documents that may be used to disseminate
intelligence or investigative information or to set leads.

(e) Documents Implementing Sensitive Investigative Techniques:  These documents are
utilized to request implementation of a specific, sensitive investigative technique.
Describing these documents further would reveal the technique or non-public
information concerning the technique.

(f) Memoranda:  These documents are ordinarily communications to DOJ officials from

---

[25] The designation "FD" is attached to forms created and utilized internally by the FBI.

FBI officials, from one person to another in FBIHQ, or from one person to another in an FBI field office or legat. Generally, they serve to assist in the overall supervision of a case by summarizing pertinent details of an investigation.

(g) Leads: A lead is a request for action by, or information from, an FBI field office or legat or FBIHQ division.

(h) Federal Grand Jury Subpoenas and Subpoenaed Information: This category of documents consists of federal grand jury subpoenas and the documents collected as a result of these subpoenas. This information can be used as evidence in grand jury proceedings or other court proceedings. The information can also be incorporated into FBI documents that may be used to disseminate intelligence or investigative information or to set leads.

(i) 1A Envelopes (FD-340): These envelopes are used to organize and store documents that need to be stored separately from the FBI file to which they are attached, due to their size. They usually contain handwritten notes of interviews, photographs, and other evidentiary documents.

(j) Accomplishment Reports (FD-515): The FD-515 was an internal FBI form used by FBI personnel to report investigative accomplishments. The forms were submitted at various stages of an investigation to report events, such as an arrest, conviction, sentencing, asset seizure, or disruption or dismantlement of a criminal enterprise. They were also used to list law enforcement techniques used in an investigation, including assistance from another government agency.

(k) Investigative Accomplishments Reports (FD-542): The FD-542 was an internal FBI form used by FBI personnel to capture and report on investigative and intelligence related accomplishments.

(l) Travel Request Forms (FD-540): The FD-540 was an internal FBI form used by employees to request authorization for official government travel and to annotate travel expenses incurred during official government travel.

(m) Emails: This category of documents consists of internal and external electronic mail communications between employees in the FBI and between employees of the FBI and other government agencies used to discuss the direction or focus of an investigation. If an email is determined to be of investigatory importance, the email is serialized into the relevant case file.

(n) FBI Records Checks: These documents are computerized printouts of the results of checks of databases concerning FBI records, local law enforcement records, and/or business records. The information from these records checks is often incorporated into investigative reports or ECs for lead purposes.

(o) FBI Investigative Reports: These are documents are summaries of investigations as of

the date of the report.  The purpose of these documents is to advise FBIHQ and FBI field offices or legats of information obtained concerning a particular investigation.

(p) <u>Other Miscellaneous Administrative Documents:</u> The FBI uses various types of forms throughout an investigation that do not fit into an official government format.  Documents included in this category may include, but are not limited to, storage envelopes (other than the IA envelopes), bulky exhibit cover sheets, transmittal forms (e.g., facsimile cover sheets), administrative letters, and routing slips.

(q) <u>Other Investigatory Documents:</u> This category consists of various types of documents containing information, including evidence, gathered during an FBI investigation, the sources from/by which such information was gathered, methods used to obtain the information, and methods used to analyze the information.  To describe the investigative documents in this category more specifically could reveal the scope of FBI investigations, as well as the sources and methods being utilized by the FBI.

(r) <u>Computer Analysis Evidence Response Team ("CART") Notes, Reports, and Other Information:</u> The FBI's CART provides digital forensics, technical capabilities, and related services and support to the FBI and other law enforcement agencies.  CART provides support to investigations that are reliant, in whole or in part, on digital evidence, namely through the acquisition, preservation, examination processing, and presentation of stored digital information in computers and other electronic devices and media.  CART analyzes a variety of devices and media, including, but not limited to, desktop and laptop computers, CDs, DVDs, cell phones, digital cameras, digital media players, and flash media.

(s) <u>Photographs:</u> Recorded images may have been seized during an investigation and may provide leads in the investigation.  Therefore, these images are often evidentiary in nature.  Photographs are often created by the FBI when documenting locations of evidence, evidence itself, and crime scenes, and for other investigatory reasons.

(t) <u>Source Documents and Information:</u> This category of information consists of information provided to the FBI or other law enforcement entity by a source.  The information may later be used as testimony or other type of evidence in court proceedings.  Additionally, this information can be incorporated into other FBI documents that may be used to disseminate intelligence or investigative information or to set leads.

(u) <u>Third-Party Information:</u> This category includes documents or information provided to the FBI from third parties (other than a source).

(v) <u>Victim Identification:</u> This category includes information concerning victims of crimes.

(w) <u>Evidence Logs/Chains of Custody:</u> These types of documents are used to track

evidence in an investigation.

(x) <u>FBI Computer Printouts:</u> These documents are printouts from internal FBI computer systems that describe information concerning FBI investigations. Information in these documents may include file numbers, names and addresses of subjects and other individuals, key dates and locations, names of Special Agents ("SA") assigned to investigations, and other similar information.

(y) <u>Internet Printouts:</u> These documents consist of information from public websites. Disclosure of information gathered from a public source may itself reveal the direction or focus of an investigation by demonstrating what an investigator found to be relevant.

(z) <u>Documents from Foreign Law Enforcement Agencies and Cooperation Requests:</u> This category includes documents provided to the FBI by foreign law enforcement agencies and ECs requesting assistance from or by the FBI. These documents may be used as evidence in court proceedings and contain information that is often incorporated into other documents that may be used to disseminate intelligence or investigative information or to set leads.

(aa) <u>Inventory of Bulky Nonevidentiary Property Forms (FD-192):</u> These forms are administrative forms used to describe property acquired by an FBI SA in an investigation. The form includes information, such as the date the property was acquired, source from which the property was acquired, and a description of the property.

(bb) <u>Serial Charge-Out Forms (FD-5):</u> These are administrative forms used to document why certain serials have been removed or replaced within FBI files.

(cc) <u>Payment Request Forms (FD-794):</u> These are administrative forms used for commercial, confidential, and undercover reimbursement.

(dd) <u>Receipt for Property Forms (FD-597):</u> These forms detail items received, returned, released, or collected or seized by the FBI.

*Functional Categories of Information*

(60)    The FBI categorized the types of exempt records into two functional categories –

evidentiary and investigative material and administrative material. These categories are

discussed in more detail below.

(61)    A record can fall into one or more functional categories. For example, a record,

such as an FBI Investigative Report, may serve several purposes and may contain multiple

categories of information, such as witness statements, administrative directions, and evidentiary material. Therefore, the information in each record could be included in multiple categories.

Category 1: Evidentiary and Investigative Material

(62)    This category includes evidence, analyses of evidence, and derivative communications discussing or incorporating evidence. A derivative communication describes, verbatim or in summary, the contents of the original document, how it was obtained, and how it relates to an investigation. Derivative communications can be used to report information to FBIHQ, field offices or legats, other law enforcement agencies, or other federal agencies, to advise them on the progress of an investigation or to elicit assistance in handling investigative leads. The following subparagraphs describe the types of evidentiary and investigative material in the responsive records at issue and the anticipated harm that could reasonably result from the release of this material.

(63)    *Confidential Witness Statements*: Confidential witness statements are one of the principal tools used to support facts that form the basis for prosecution. These statements contain information obtained from confidential witnesses who have knowledge of the criminal activities that resulted in the investigation. If the FBI released this information, the witnesses that have chosen to cooperate with law enforcement could be subjected to retaliation, intimidation, or physical or mental harm. This could have a chilling effect on future prosecution inasmuch as potential witnesses might fear exposure and reprisal from the subject(s) of the investigation. Implicit in conducting interviews in an investigation of the nature of the investigation at issue is the notion that an individual's identity and the information provided by that individual (outside of its investigative use) will be afforded confidentiality. The FBI goes to great lengths to protect and maintain an individual's confidentiality since it is an integral part of

a successful investigation and, ultimately, prosecution. The release of witness statements could disrupt and harm investigative and prosecutorial actions.

(64)    *Exchange of Information between the FBI and Local Law Enforcement Agencies and/or Foreign Law Enforcement Agencies*: Release of information exchanged between the FBI and its local law enforcement and/or foreign law enforcement partners would disclose evidence, investigative information, and criminal intelligence developed by various agencies that cooperated with—and provided information to—the FBI in the investigation at issue. Release of information would identify the investigative interest(s) of particular agencies and thus tip-off such individual(s), and would provide such individual(s) with the opportunity to destroy evidence or alter behavior to avoid detection.

Category 2: Administrative Material

(65)    Material falling within this category includes items such as case captions, identities of FBI field offices, dates of investigative actions, and detailed instructions designed to ensure that investigative procedures are conducted within appropriate FBI and DOJ guidelines. The following paragraphs describe the types of administrative material contained in the records at issue and the anticipated harm that could reasonably result from the disclosure of such material to the investigation and to any prosecution.

(66)    *Reporting Communications*: These communications permit an agency to monitor the progress of an investigation and to facilitate its conduct. These communications have the potential to reveal aspects of the cooperation of local or state government agencies in the investigation as they are replete with detailed information about the FBI's investigative activities as well as detailed information about potential witnesses and confidential sources. Additionally, they contain background information about third-party individuals, the origins of pertinent

information connecting these individuals to the investigation, and their connection(s) to

subject(s).  The release of this information would reveal the nature and scope of the investigation

at issue by revealing: investigative steps taken to obtain witness and source interviews;

techniques and investigative methods used to solicit and compile information from various

sources; and potential or perceived challenges in the investigation.

(67)    _Miscellaneous Administrative Documents_: These documents include items such as

transmittal forms and other standardized forms used for a variety of purposes.  These types of

documents have been used throughout the investigation at issue for many routine purposes;

however, the manner in which they have been used and organized in the investigative file also

reveals information of investigative value.  Thus, disclosure of this information could undermine

the investigation, as well as any prosecution.

## PART V: ASSERTION OF EXEMPTIONS IN THE PROCESSED RECORDS AND ASSERTION OF UNDERLYING EXEMPTIONS[26] IN THE CATEGORICALLY WITHHELD RECORDS[27]

## EXEMPTION 1 – CLASSIFIED INFORMATION

(68)    The FBI withheld classified information within Bates-numbered pages FBI 20-cv-

---

[26] The FBI preserves all applicable underlying exemptions in the records responsive to Plaintiff's request that the FBI denied in their entirety pursuant to FOIA Exemption (b)(7)(A).  In light of the D.C. Circuit's ruling in _Maydak_, 218 F.3d 760, the FBI asserts underlying FOIA Exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E) to protect the FOIA exempt portions of the responsive records within the investigative file at issue. The justification for the underlying exemptions is provided to the extent public disclosure and discussion of the applicable exemptions will not adversely affect the criminal investigation by revealing its nature, scope, focus, and other details.  At this time, public disclosure of more detailed information pertaining to the application of exemptions would undermine the interests protected by Exemption (b)(7)(A).

[27] In the categorically exempt records, the FBI identified documents that originated with, or contain information from, other law enforcement ("LE") agencies.  This information is denied in its entirety pursuant to FOIA Exemption (b)(7)(A), as well as one or more of the asserted underlying FOIA exemptions referenced herein.  When the 7(A) exemption no longer applies, due to the completion of enforcement proceedings, the FBI will refer these records to the applicable LE agencies for consultation, if such consultation remains necessary.

1527-1 and FBI 20-cv-1527-3-4.  *See* Exh. T.  The FBI's analysis for withholding classified

information contained in the records at issue is based on the standards articulated in the FOIA

statute, 5 U.S.C. § 552(b)(1).  Exemption 1 protects from disclose records that are:

> specifically authorized under criteria established by an Executive Order to be kept
>
> secret in the interest of national defense or foreign policy; and
>
> properly classified pursuant to such Executive Order.

(69)    Before I consider an Exemption (b)(1) claim for withholding agency records, I

determine whether the information in those records satisfies the requirements of Executive Order

("E.O.") 13526, the executive order governing the classification and protection of information

that affects the national security and whether the information complies with the various

substantive and procedural criteria of that order.  E.O. 13526, signed by President Barack Obama

on December 26, 2009, is the order that currently applies to the protection of national security

information.  I am bound by the requirements of E.O. 13526 when making classification

determinations.

(70)    For information to be properly classified, and thus properly withheld from

disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in

E.O. 13526 § 1.1(a):

1. an original classification authority is classifying the information;

2. the information is owned by, produced by or for, or is under the control of the
   United States Government;

3. the information falls within one or more of the categories of information listed in
   § 1.4 of the order; and

4. the original classification authority determines that the unauthorized disclosure of

the information reasonably could be expected to result in damage to the national

security, which includes defense against transnational terrorism, and the original

classification authority is able to identify or describe the damage.

(71)     As I will explain in further detail below, in my role as an original classification

authority, I have determined that any information withheld pursuant to Exemption (b)(1) in

response to Plaintiff's FOIA request is under the control of the United States Government, is

classified, and requires a classification marking at the "Secret" level since the unauthorized

disclosure of this information reasonably could be expected to cause serious damage to the

national security. *See* E.O. 13526 § 1.2(a)(2). In addition to these substantive requirements,

certain procedural and administrative requirements of E.O. 13526 must be followed before

information can be considered properly classified, such as proper identification and marking of

documents. In particular, I made certain that all procedural requirements of E.O. 13526 were

followed:

1. each document was marked as required and stamped with the proper classification
   designation;

2. each document was marked to indicate clearly which portions are classified, which
   portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b);

3. the prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were
   adhered to;

4. the declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed; and

5. any reasonably segregable portions of the classified documents that did not meet the
   standards for classification under E.O. 13526 were declassified and marked for
   release, unless withholding was otherwise warranted under applicable law.

### FINDINGS OF THE DECLARANT REGARDING EXEMPTION 1

(72)    With the above requirements in mind, I personally and independently examined Bates-numbered pages FBI 20-cv-1527-1 and FBI 20-cv-1527-3-4, containing the FBI information withheld pursuant to Exemption 1. Where information is withheld pursuant to Exemption 1, I determined all the substantive, procedural, and administrative requirements set forth above were satisfied. Further, as explained below, I concluded that the information protected pursuant to Exemption (b)(1) was properly classified, continues to warrant classification at the "Secret" level, and is exempt from disclosure pursuant to E.O. 13526 § 1.4(c) – "intelligence activities (including covert action), intelligence sources or methods, or cryptology." Further explanation for the FBI's assertion of Exemption 1 in Bates-numbered pages FBI 20-cv-1527-1 and FBI 20-cv-1527-3-4, is set forth in my classified *ex parte, in camera* declaration.

*E.O. 13526 § 1.4(c) – Intelligence Activities, Sources, and Methods*

(73)    E.O. 13526 § 1.4(c) exempts intelligence activities (including covert action), intelligence sources or methods, or cryptology from disclosure. An intelligence activity, source, or method is any activity, use of a source, or method utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest. An intelligence method is used to indicate any process (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity, source, or method has two characteristics. First, the intelligence activity, source, or method – and information generated by it – is needed by the U.S. intelligence agencies to carry out their respective missions. Second, confidentiality must be maintained with respect to the activity, source, or method if its viability, productivity, and usefulness are to be preserved.

(74)    In the records at issue, the FBI withheld information pursuant to Exemption 1, in conjunction with FOIA Exemption (b)(3) and the National Security Act of 1947 (50 U.S.C. § 3024(i)), as amended by the Intelligence Reform and Prevention Act of 2004, to protect intelligence activities, sources, and methods utilized by the FBI to gather intelligence.[28] The information consists of detailed intelligence information gathered or compiled by the FBI on a specific individual(s) of national security interest. The information is classified because its release would reveal actual intelligence activities, sources, and methods used by the FBI against specific targets threatening execution of victims of crimes committed by Jeffrey Epstein, and would disclose the intelligence-gathering capabilities of the activities, sources, and methods directed at the specific targets. The information obtained from and concerning the intelligence activities, sources, and methods is very specific in nature and known to very few individuals.

(75)    It is my determination that disclosure of specific information describing the intelligence activities, sources and methods, within the records at issue, and which are still used by the FBI to gather intelligence, could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities, including criminal enterprises, to discover actual intelligence-gathering techniques used by the FBI and the capabilities of such techniques to obtain information on specific target(s) during a specific time; (2) disclosure would reveal specific target(s) of certain national security-related investigations; and (3) disclosure would reveal the criteria used in and priorities assigned to the FBI's national security-related investigations. With the aid of this detailed information, hostile entities, including criminal enterprises, could develop countermeasures, which could, in turn, severely

---

[28] The FBI inadvertently did not assert FOIA Exemption category (b)(3)-4 for the same information withheld pursuant to FOIA Exemption (b)(1); therefore, category (b)(3)-4 is being asserted at this time. *See Vaughn* index (Exhibit T) for the updated *Vaughn*-coded withholdings.

disrupt the FBI's intelligence-gathering capabilities.  This severe disruption would result in severe damage to the FBI's efforts to detect and apprehend those who violate the national security and criminal laws of the United States.  The FBI properly withheld information pursuant to Exemption 1 (at times, in conjunction with Exemption 3) specific to intelligence activities, sources, and methods because disclosure reasonably could be expected to cause serious damage to the national security and render the intelligence activities, sources, and methods unusable in the future.

## EXEMPTION 3 – INFORMATION PROTECTED BY STATUTE

(76)    Exemption (b)(3) exempts from disclosure matters "specifically exempted from disclosure by statute . . . if that statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3). The Open FOIA Act of 2009 established an additional requirement that any statute "enacted after the date of enactment of the OPEN FOIA Act of 2009, [must] specifically cite[] to this paragraph" in order to qualify under Exemption 3.

### (b)(3)-1: CHILD VICTIMS' AND CHILD WITNESSES' RIGHTS ACT - 18 U.S.C. § 3509

(77)    Within Exemption category (b)(3)-1, the FBI withheld information pertaining to child victims and witnesses.[29]  *See* Exh. S. The privacy protection measures enacted in 1990, within the Child Victims' and Child Witnesses' Rights Act, 18 U.S.C. § 3509, were created to protect minors involved in criminal proceedings.  Though this statute was enacted well before

---

[29] Exemption categories that only apply to the Vault records are indicated by the reference to Exhibit S.  Exemption categories that only apply to the other records processed in response to Plaintiff's FOIA request are indicated by the reference to Exhibit T.  Exemption categories that apply to both sets of records are indicated by the reference to Exhibits S and T.

the Open FOIA Act of 2009, it refers to particular types of matters that must be withheld from

public disclosure. Specifically, 18 U.S.C. § 3509(d) protects from disclosure certain records

containing identifying information of children involved in criminal proceedings. A child is

defined in 18 U.S.C. § 3509(a)(2) as "a person who is under the age of 18, who is or is alleged to

be (A) a victim of a crime of physical abuse, sexual abuse, or exploitation; or (B) a witness to a

crime committed against another person." Accordingly, the FBI properly asserted Exemption 3,

at times in conjunction with Exemptions 6, 7(C), and 7(D), to protect names, images, and other

identifying information of child victims and witnesses.

### (b)(3)-2: FEDERAL GRAND JURY INFORMATION – FEDERAL RULE OF CRIMINAL PROCEDURE (6)(e)

(78)    Within Exemption category (b)(3)-2, the FBI withheld federal grand jury

information pursuant to Federal Rule of Criminal Procedure 6(e).[30] *See* Exh. S. As relevant to 5

U.S.C. § 552(b)(3)(B), Rule 6(e) is a statute enacted before the date of enactment of the OPEN

FOIA Act of 2009.[31]  It is well-established that Rule 6(e) embodies a broad, sweeping policy of

preserving the secrecy of grand jury material regardless of the substance in which the material is

contained. Records responsive to Plaintiff's request detail matters occurring before one or more

federal grand juries empaneled in relation to the investigation at issue. Specifically, the

investigative file contains information about the recipients of federal grand jury subpoenas;

---

[30] As prescribed by 18 U.S.C. § 3771 (subsequently repealed by Pub. L. 100-702, Title IV, § 404(a)(1) (Nov. 19, 1988) and replaced by 28 U.S.C. § 2074), proposed rules become effective 90 days after the Chief Justice reports them to Congress. By order of April 26, 1976, the Supreme Court adopted amendments to the Federal Rules of Criminal Procedure, which included Rule 6(e), and reported the amendments to Congress. Congress voted to delay the effective date of several of the proposed rules, to include Rule 6(e), "until August 1, 1977, or until and to the extent approved by Act of Congress, whichever is earlier." Pub. L. No. 94-349 § 1, 90 Stat. 822 (1976). Subsequently, Congress, by statute, enacted a modified version of Rule 6(e). *See* Pub. L. No. 95-78, § 2(a), 91 Stat. 319 (1977), Fed. R. Crim. P. Rule 6(e).
[31] The OPEN FOIA Act of 2009 was enacted on October 28, 2009. *See* Pub. L. 111-83, 123 Stat. 2142, 2184.

information that identifies specific records subpoenaed by a federal grand jury; and copies of

specific records provided by recipients in response to federal grand jury subpoenas. Wherever

the FBI withheld this information, it found a clear nexus to federal grand jury proceedings. Any

disclosure of this information would clearly violate the secrecy of the grand jury proceedings and

could reveal the inner workings of a federal grand jury, which the FBI is precluded from doing.

Thus, the FBI properly withheld this information pursuant to Exemption 3, in conjunction with

Rule 6(e).

### (b)(3)-3: JUVENILE JUSTICE AND DELINQUENCY ACT – 18 U.S.C. § 5038

(79)    Within Exemption category (b)(3)-3, the FBI withheld information concerning

juvenile criminal records, which is specifically exempt pursuant to 18 U.S.C. § 5038, a statute

enacted as part of the Juvenile Justice and Delinquency Act of 1974. *See* Exh. S. This law

protects from disclosure a juvenile's name, date of adjudication, court, offense(s), and sentence,

along with any notation that the matter was a juvenile adjudication. For purposes of this law, a

"juvenile" is a person who has not attained his or her eighteenth birthday, or for the purposes of

proceedings and disposition for an alleged act of juvenile delinquency, a person who has not

attained his or her twenty-first birthday. 18 U.S.C. § 5031. For purposes of this law, "juvenile

delinquency" is a violation of a law of the United States committed by a person prior to his or

her eighteenth birthday which would have been a crime if committed by an adult. *Id.* As

relevant to 5 U.S.C. § 552(b)(3)(B), the Juvenile Justice and Delinquency Act was originally

passed in 1974, *see* Pub. L. No. 93-415, Title V, § 508, Sept. 7, 1974, 88 Stat. 1137, and has

been amended or reauthorized numerous times since 1974. The disclosure protections in 18

U.S.C. § 5038 were added in 1974 and are still in effect. This statute states that during a juvenile

delinquency proceeding, all information and records relating to the proceeding, which are

obtained or prepared by an employee of the court or an employee of any other government

agency, shall not be disclosed directly or indirectly to anyone other than the judge, counsel for

the juvenile, and the government, or others entitled to receive juvenile records pursuant to this

Act. 18 U.S.C. § 5038(c). Furthermore, throughout and upon completion of the juvenile

delinquency proceeding, the records shall be safeguarded from disclosure to unauthorized

persons. 18 U.S.C. § 5038. As relevant here, in the records at issue, the FBI withheld information

pertaining to the arrests and criminal history information of third-party juveniles. Plaintiff's

request does not meet the specific circumstances set forth in the statute for disclosure; therefore,

the FBI properly withheld the records pursuant to Exemption 3, in conjunction with Exemptions

6 and 7(C).

### (b)(3)-4: NATIONAL SECURITY ACT OF 1947, AS AMENDED - 50 U.S.C. § 3024(i)(1)

(80)    In conjunction with FOIA Exemption (b)(1) as described above, the FBI withheld

information pursuant to Section 102A(i)(1) of the National Security Act of 1947 ("NSA"), as

amended by the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), within

Bates-numbered pages FBI 20-cv-1527-1 and FBI 20-cv-1527-3-4. *See* Exh. T.[32]  This statute

provides that the Director of National Intelligence ("DNI") "shall protect from unauthorized

disclosure intelligence sources and methods."[33]  As relevant to 5 U.S.C. § 552(b)(3)(B), the

National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act

of 2009.  On its face, this federal statute leaves no discretion to agencies about withholding from

---

[32] Information on Bates-numbered page FBI 20-cv-1527-22 is being withheld under Exemption 3 not in conjunction with Exemption 1 because the information is not classified. However, the information does pertain to intelligence sources and methods.

[33] Section 102A(i)(1) of the National Security Act was previously codified at 50 U.S.C. § 403(i)(1).  As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is now codified at 50 U.S.C. § 3024(i)(1).

the public information about intelligence sources and methods. Thus, the protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute. *See CIA v. Sims*, 471 U.S. 159 (1985).

(81)    To fulfill its obligation to protect intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the classification of information under applicable laws and Executive Orders and other presidential directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1). In implementing this authority, the DNI promulgated Intelligence Community Directive 700, which provides that IC elements shall protect "national intelligence and intelligence sources and methods and activities from unauthorized disclosure."[34] The FBI is one of 18 member agencies comprising the IC, and as such must protect intelligence sources and methods.

(82)    Given the plain congressional mandate to protect the IC's sources and methods of gathering intelligence, the FBI determined that intelligence sources and methods would be revealed if any of the information withheld under this exemption category is disclosed. Therefore, the FBI is prohibited from disclosing such information under 50 U.S.C. § 3024(i)(1).[35]

(83)    The FBI is asserting Exemption 3, in conjunction with Exemption 1, to protect information within Bates-numbered pages FBI 20-cv-1527-1 and FBI 20-cv-1527-3-4, that would reveal intelligence sources and methods. Release of any of the withheld information

---

[34] Intelligence Community Directive (ICD) 700, dated June 7, 2012, at ¶ E.2.a.
[35] Although 50 U.S.C. § 3024(i)(1) does not impose a requirement to articulate harm, disclosure of this information presents a bona fide opportunity for individuals to develop and implement countermeasures, resulting in the loss of significant intelligence information, sources, and methods relied on by national policymakers and the IC to safeguard the national security of the United States.

would reveal classified intelligence sources and methods protected pursuant to Exemption 1, although, notably, 50 U.S.C. § 3024(i)(1) protects sources and methods regardless of whether they are classified. *See Sims*, 471 U.S. at 176.

(84)    In further support of the FBI's assertion of Exemptions 1 and 3, it is submitting a classified declaration *ex parte, in camera*. An *in camera* declaration is the most appropriate way to provide additional detail about the FBI's withholding of information protected pursuant to Exemption 3 (and the NSA of 1947, as amended), since the FBI is statutorily precluded from publicly disclosing details about the withheld information.

## EXEMPTION 5 – PRIVILEGED INFORMATION

(85)    Exemption 5 of the FOIA exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

(86)    Exemption 5 has been construed to exempt documents or information normally privileged in the civil discovery context and incorporates the deliberative process privilege, the attorney work product privilege, and the attorney-client privilege.[36] Generally, the deliberative process privilege protects pre-decisional, deliberative communications that are part of a process by which agency decisions are made. It protects opinions, advice, evaluations, deliberations, proposals, and recommendations that are part of an agency's decision-making process, as well as the selection and sorting of factual information relied on as part of the decision-making process. The attorney work product privilege protects documents and other memoranda prepared by an attorney, or under the direction of an attorney, as part of, or in reasonable anticipation of, litigation.

---

[36] The attorney-client privilege does not apply to the records at issue.

(87)    In order to apply Exemption 5, agencies must first satisfy the threshold

requirement – i.e., show that the information protected consists of "inter-agency or intra-agency"

information.  Once the threshold is satisfied, agencies must satisfy the elements of the pertinent

privilege.  With respect to the deliberative process privilege, agencies must show that the

withheld information was both pre-decisional – i.e., antecedent to the final agency decision – and

deliberative – i.e., part of the process in which the agency engaged in an effort to reach a final

decision (whether or not any final decision was ever reached).  With respect to the attorney work

product privilege, agencies must show that the withheld information was created by, or for, an

attorney in reasonable anticipation of litigation.

### (b)(5)-1: DELIBERATIVE PROCESS PRIVILEGE

(88)    Within Exemption category (b)(5)-1, the FBI withheld privileged, deliberative

information within Bates-numbered pages FBI 20-cv-1527-112-115, 132-133, 175, 185, 191,

262-263, 265-266, 405, 408-409, 414, 422-423, 686-688, 734, 787, and 1034.[37]  See Exh. T.  The

deliberative process privilege protects the internal deliberations of the government by insulating

recommendations, analyses, opinions, and other non-factual information comprising the

decision-making process.  Exemption 5 allows for the withholding of such privileged material –

i.e., material that contains, or was prepared in connection with opinions, advice, evaluations,

deliberations, policies, proposals, conclusions, or recommendations.  The privilege also protects

records and information that if disclosed, would reveal an agency's collection of multitudinous

facts, and the sorting, evaluation, and analysis of those facts in order to make recommendations

or reach a final agency decision.  Exemption 5, when asserted in conjunction with the

---

[37] The FBI inadvertently applied Exemption category b5-1 PER OIP on Bates-numbered pages
FBI 20-cv-1527-146-147 and 157-159.  The FBI withdraws this coded category.

deliberative process privilege, is predicted on the recognition that release of this privileged information would inhibit the government's development of policy and stifle its decision-making process.  Furthermore, exempting such information from disclosure protects against public confusion that might result from preliminary disclosure of opinions and information that do not, in fact, reflect the final views or policies of the agency.  The exemption and privilege together protect not only the withheld information, but also the integrity of the deliberative process itself where exposure of the process would result in harm.

(89)     The FBI invokes Exemption 5 and the deliberative process privilege because FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew that their opinions of the moment might be made a matter of public record at some future date, and because such self-censorship would, in turn, degrade the quality of agency decisions by depriving the decision-makers of fully explored options developed from robust debate.

*Deliberative Information Located within FOIA Processing Records*

(90)     The FBI relied on Exemption 5, and the deliberative process privilege, to withhold information within FOIA processing records.  These intra-agency communications, such as internal FBI search slips (Bates-numbered pages FBI 20-cv-1527-112, 132, 408-409, 414, and 422-423), electronic surveillance ("ELSUR") search slips (Bates-numbered pages FBI 20-cv-1527-113 and 133), and internal FBI administrative tracking forms[38] (Bates-numbered pages FBI 20-cv-1527-175, 185, 191, 405, 734, 787, and 1034) contain information that is pre-

---

[38] The administrative tracking form is attached by the FBI to incoming correspondence from requesters seeking the status of, or other information regarding, open FOIA requests.  This form may be used to provide instructions from the FOIPA processing team on how to respond to a FOIA requester's inquiry.

decisional because it pertains to deliberations on how best to respond to specific FOIA requests.

(91)    The internal FBI search slips, ELSUR search slips, and administrative tracking forms contain preliminary determinations on leads to locate potentially responsive records and provide internal FBI personnel with instructions on suggested search avenues to conduct an adequate search. The information withheld under Exemption 5 within the ELSUR search slips includes handwritten notes from a FOIA processor indicating potential follow-ups for further research and a notification to the processing team lead on the next set of steps to be taken for the search. The search slips are pre-decisional because they document the process by which a final search decision on a FOIA request is made. That process includes determining where responsive information may be maintained and where searches should be conducted; whether information located during a search is responsive to or outside the scope of a request; whether information is exempt or can be released; and a host of other issues that may need to be considered as part of rendering a final decision on a FOIA request. The search slips are also deliberative as they reflect the analysis of the FOIPA analyst in determining which search avenues may lead to potentially responsive record and form the basis for the next steps to take in response to a FOIA request. The reasonably foreseeable harm in disclosure is the curtailment of proper deliberations during the processing of FOIA requests and public confusion as to the FBI's final decisions. If this information is released, FBI FOIA personnel would likely be less willing to share raw, unrefined ideas and candid feedback regarding their analysis of various FOIA processing issues, if their ideas and feedback could be publicly disclosed. Additionally, disclosure would create public confusion as the FBI's final FOIA processing decision – it would show considered decisions never adopted and actions never taken and cause doubt as to the FBI's final decision or action. Finally, although factual information is generally not privileged under the deliberative

process privilege, it can be withheld if it is inextricably intertwined with deliberative information. The FBI concluded that factual information in the responsive records at issue is part of the deliberations, inextricably intertwined with deliberative information, and is exempt under other exemptions, including Exemptions 6, 7(C), and 7(E), and cannot be extricated from deliberative material.

*Deliberative Email Communications*

(92)    The FBI asserted Exemption 5, and the deliberative process privilege, to withhold information within email inquiries to and from Records Management Division ("RMD")[39] and FBI field offices ("FBI FO") requesting information as to the pending status of an investigation and the status of the FOIA processing associated with the pending investigation (Bates-numbered pages 20-cv-1527-114-115, 262-263, and 265-266). During the search for responsive records for FOIA requests, at times, the FBI locates pending investigatory files within the responsive records. Before the FBI responds to FOIA requesters the FBI seeks advice from the FBI FO assigned to the investigation as to the status of the investigation, and if information can be processed for release to a requester or should be withheld pursuant to FOIA Exemption 7(A) and underlying FOIA exemptions. The FBI relied on Exemption 5 and the deliberative process privilege to protect the strategy development on how to handle the FOIA response to an administrative FOIA request. RIDS personnel consulted with FBI Special Agents ("SA") who were the subject matter experts of the investigatory records pertaining to Jeffrey Epstein. These communications contain advice and opinions from the SAs on how the FBI should respond to the administrative request, and provide the SAs' recommendations. This consultation process is specifically designed to protect FBI investigative interests when the FBI responds to FOIA

---

[39] RMD was renamed the Information Management Division ("IMD") in May 2018.

requests. Though responding to FOIA is not inherently a law enforcement function, FBI FOIA

responses can negatively impact the FBI's law enforcement function. For example, failure to

fully research the status of an investigation could result in the acknowledgment through the

FOIA of an investigation or investigative interest not previously known by, for example, the

investigative subject(s). Thus, providing communications containing deliberative discussions

related to responding to a FOIA request could allow investigative subjects to preemptively

employ countermeasures to avoid FBI investigative strategies, destroy evidence of wrongdoing,

or intimidate potential witnesses to thwart the FBI's investigative efforts. To avoid such

investigative harms, the FBI has developed strategies for responding to FOIA requests which it

utilize the tools for withholding sensitive, deliberative, and other types of information. This

ensures that the FBI is able to meet the legal requirements of the FOIA, while fully protecting the

FBI's interests. In this instance, revealing the FBI's FOIA response strategy described in the

records at issue would provide an example of how the FBI responds to FOIA requests when

certain investigative criteria exist. This would allow requesters to judge, based on the FBI's

FOIA response, the nature of certain FBI law enforcement investigations. The foreseeable harm

caused by the release of deliberative communications is detailed below.

(93)     Finally, the FBI relied on Exemption 5, and the deliberative process privilege, to

withhold information within email inquiries to and from RMD and DOJ's Office of Public

Affairs ("OPA"), deliberating a FOIA requester's request for expedited FOIA processing, and

discussing if the requester met the statutory requirements for expedited processing (Bates-

numbered pages FBI 20-cv-1527-686-688). These communications contain information related

to inter-agency deliberations as agency employees are requesting, providing feedback, making

proposals, and coordinating prior to coming to a consensus on a final agency decision concerning

whether expedited processing will be approved or denied. The information withheld is pre-decisional in that it does not reflect final agency decision. The foreseeable harm in the release of such deliberative communications is detailed below.

(94)    In sum, the information located within these records is both deliberative and pre-decisional. These communications and internal FBI tracking forms with proposed instructions contain information related to intra-agency deliberations as agency employees are requesting or providing feedback, making proposals, or working to come to a consensus on final agency decisions. Additionally, in compliance with the FOIA Improvement Act of 2016, these documents were created less than 25 years before the submission of Plaintiff's request and before the FOIA requests of other FOIA requesters for similar records.

(95)    **Reasonable Foreseeable Harm:** The FBI determined that there is reasonable foreseeable harm in releasing information that reveals internal FBI deliberations, which include intra-agency communications between IMD and FBI FO personnel and inter-agency communications between FBI and OPA personnel. Release of this information would chill agency employees' willingness to share opinions, proposals, unrefined ideas, and candid feedback if they knew their discussions and recommendations could be publicly disclosed. Release could set a precedent as the FBI would be seen as unwilling to shield its employees' internal deliberations, and deliberations with other government components, from public scrutiny, and could result in hesitancy to participate fully in future deliberations. Additionally, release of this information would create public confusion because it predates final agency decisions. In instances such as in the records at issue, when feedback comprises multiple rationales and opinions on specific actions, when the candid opinions, advice, and proposed instructions for, or between, agency personnel are integral to implementing a particular strategy

or path forward, the harm to quashing candid deliberations vital to making final policy decisions is clearly foreseeable. For the reasons set forth above, the FBI properly withheld the pre-decisional, deliberative portions of the records described pursuant to Exemption 5, in conjunction with the deliberative process privilege. The FBI endeavored to segregate non-deliberative facts, whenever possible, and only withheld information, such as the internal FBI search slips concerning third-party FOIA requesters, when it found it was inextricably intertwined with deliberative information.

### (b)(5)-2: ATTORNEY WORK PRODUCT PRIVILEGE

(96)    Within Exemption category (b)(5)-2, the FBI withheld information subject to the attorney work product privilege. *See* Exh. S. The attorney work product privilege protects tangible and intangible items, such as interviews, memoranda, correspondence, mental impressions, and personal beliefs prepared or developed by an attorney, or at the direction of an attorney, as part of, or in reasonable anticipation of, litigation. The privilege is predicated on the recognition that proper preparation of a case depends on an attorney's ability to assemble information, sort relevant from irrelevant facts, and prepare his or her legal theories and strategies without intrusive or needless scrutiny.

(97)    The FBI relied on the attorney work product privilege to protect a small number of documents. These documents include: (i) two internal FBI memoranda which relay information provided by an Assistant United States Attorney ("AUSA") about the timing of Epstein's indictment and information being gathered or gathered by the FBI pursuant to the instructions of an AUSA, for the purpose of assessing a potential forfeiture action to seize Epstein's assets; (ii) one memorandum from an FBI investigator to an AUSA relating to the value of an asset owned by Epstein for consideration of its seizure, with attachments providing

supporting information gathered by the FBI regarding the value of the asset; (iii) an internal FBI memorandum that describes actions being taken by the FBI, at the direction of an AUSA, to gather evidence in support of a potential forfeiture action regarding certain of Epstein's assets; and (iv) an internal FBI memorandum that describes actions being taken by the FBI, at the direction of an AUSA, to gather evidence for the potential prosecution of Epstein and others and for seizure of an asset. The memoranda were created at the request of an AUSA in reasonable anticipation of litigation, and they provide the AUSA's prosecutorial strategy and the information the AUSA was gathering to either support an indictment of Jeffrey Epstein or a civil forfeiture action or both. These records are quintessential attorney work products and readily satisfy the elements of the attorney work product privilege because they were created at the direction of a prosecutor in anticipation of prosecution in a child prostitution criminal case and related civil forfeiture action. Release of this type of information would interfere with the government attorney's ability to properly prepare his or her legal theories and strategies and hinder him or her in providing the best representation of his or her client, i.e., the United States Government. Finally, because the attorney work product privilege protects both factual and deliberative information, segregation is not required. Accordingly, the FBI properly withheld this information pursuant to Exemption 5 in conjunction with the attorney work product privilege.

## EXEMPTIONS 6 AND 7(C) -
## CLEARLY UNWARRANTED AND UNWARRANTED INVASION OF PERSONAL PRIVACY

(98)    Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. *See* ¶¶ 53-54, *supra*, for the FBI's determination that the records at issue

meet the Exemption 7 threshold requirements.

(99)    Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  All information that applies to a particular person falls within the scope of Exemption 6.

(100)   Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes...[when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[40]

(101)   When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in the records against any public interest in disclosure.  In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name or other identifying information appears in the records at issue.  When withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure.  For purposes of these exemptions, a public interest exists only when information about an individual, such as their name or other identifying information,[41] would shed light on the FBI's operations and activities. In each instance wherein information was withheld pursuant

---

[40] The practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C). Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption 7(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions are sufficiently similar to warrant a consolidated discussion.  The privacy interests are balanced against the public's interest in disclosure under both exemptions.

[41] As used herein, identifying information includes the following: dates of birth, places of birth, residences, telephone numbers, social security numbers, singular professional titles, , unique locations, and other information that is identifiable to an individual.

to Exemptions 6 and 7(C), the FBI determined that the individual's privacy interests outweighed any public interest in disclosure.

(102)    Furthermore, since privacy concerns are typically obviated once an individual is deceased,[42] the FBI takes several steps, during FOIA processing, to ascertain the current life or death status of individuals whose names and/or other identifying information are withheld.  The FBI uses the birth date or the date of the investigation to determine whether an individual is living or deceased, to the extent either or both of these pieces of information is discernable from any identified file.  The date of birth is used to apply the judicially recognized[43] "100-year rule," i.e., if the individual was born more than 100 years before the date of the FOIA request, the FBI presumes that he or she is dead and generally the name or other identifying information is released.  The FBI also uses institutional knowledge gained from prior FOIA requests or internal records.  By using institutional knowledge, the FBI can identify with sufficient certainty the life-or-death status of certain individuals.  If the FBI is unable to determine the life-or-death status of an individual through the use of these methods, the name and other identifying information of the individual are withheld pursuant to Exemptions 6 and 7(C), when disclosure would constitute an unwarranted invasion of the individual's privacy should he or she still be alive and no public interest would be served in releasing the name or other identifying information.  It is also the FBI's policy to release names of high-ranking FBI officials in policy-making positions, as well as individuals in public-facing positions, as they generally do not have privacy rights while acting in their official capacity.  This policy is applied to the individual's position at the time of

---

[42] In some circumstances, surviving relatives of a deceased individual retain privacy interests in the individual's information, even after the individual's death.  *See generally National Archives v. Favish*, 124 S. Ct. 1570 (2004).

[43] *See, e.g., Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 665 (D.C. Cir. 2003).

the creation of the document and not the present.

### (b)(6)-1 AND (b)(7)(C)-1: NAMES AND OTHER IDENTIFYING INFORMATION OF THIRD PARTIES OF INVESTIGATIVE INTEREST

(103)  Within Exemption categories (b)(6)-1 and (b)(7)(C)-1, the FBI withheld the names and other identifying information of third parties of investigative interest to the FBI. *See* Exh. S.  Being identified as a subject of FBI investigative interest carries a strong negative connotation and a stigma, regardless of whether an individual committed a criminal act.  Public release of the identity of these individuals could subject them to harassment or embarrassment, as well as undue public attention.  Furthermore, it could result in professional and social repercussions, due to resulting negative stigma.  Accordingly, the FBI determined that these individuals maintain substantial privacy interests in not having their identity disclosed.  In contrast, disclosing personal information about these individuals would not significantly increase the public's understanding of the FBI's operations and activities,  Thus, the FBI concluded that there is no public interest sufficient to override the individuals' substantial privacy interests.  For these reasons, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

### (b)(6)-2 AND (b)(7)(C)-2: NAMES AND OTHER IDENTIFYING INFORMATION OF FBI SPECIAL AGENTS AND PROFESSIONAL PERSONNEL, INCLUDING VICTIM SPECIALISTS

(104)  Within Exemption categories (b)(6)-2 and (b)(7)(C)-2, the FBI withheld the names and other identifying information of FBI SAs and professional personnel, including Victim Specialists.  *See* Exhs. S and T.  These FBI personnel were responsible for conducting and supervising the investigation or investigative activities and for maintaining the investigative file related to the child prostitution investigation of Jeffrey Epstein, reflected in the records responsive to Plaintiff's request.  These responsibilities include, but are not limited to, the following: coordinating and completing tasks in support of the FBI's investigative and

administrative functions, compiling information, and reporting on the status of the investigation.

(105)   Assignments of SAs to any particular investigation are not by choice.  Publicity, adverse or otherwise, arising from a particular investigation, may seriously prejudice their effectiveness in conducting other investigations or performing other day-to-day work.  The privacy consideration is also applied to protect FBI SAs, as individuals, from unofficial questioning as to this or other investigations or investigative activities, regardless of current employment with the FBI.  FBI SAs investigate various federal criminal law and national security-related violations.  The publicity associated with the release of an SA's identity in connection with a particular investigation could trigger hostility toward that particular SA.  During the course of an investigation, an SA may engage with all strata of society, conducting searches and making arrests, both of which result in reasonable, but, nonetheless, serious disturbances to people and their lives.  Persons targeted by an FBI investigation, and those sympathetic to those targeted, could seek to inflict violence on an SA based on his or her participation in the investigation.  This is because an individual targeted by law enforcement may carry a grudge against those involved in the investigation, which may last for years.  These individuals may seek revenge on SAs and other employees involved in a particular investigation. There is no public interest served by disclosing the identities of the SAs because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities.  Thus, disclosure of this information would constitute a clearly unwarranted invasion of their personal privacy, and the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

(106)   The FBI also withheld the names and other identifying information of FBI professional staff members pursuant to Exemption categories (b)(6)-2 and (b)(7)(C)-2.  These

FBI professional staff members were assigned to handle tasks related to the child prostitution investigation of Jeffrey Epstein. Similar to FBI SAs, these FBI employees could be targeted for reprisal based on their involvement in specific investigations. Furthermore, the FBI professional staff members were, and possibly are, in positions of access to information regarding official law enforcement investigations, and therefore could become targets of inquiries for unauthorized access to investigative information if their identifies are released. Thus, these individuals maintain substantial privacy interests in not having their identity disclosed. In contrast, the FBI concluded that no public interest would be served by disclosing the identities of these FBI professional staff members to the general public because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities. Accordingly, after balancing these professional staff members' substantial privacy interests against the non-existent public interest, the FBI determined that disclosure of this information would constitute a clearly unwarranted invasion of their personal privacy. Therefore, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

(107)   Finally, the role of a Victim Specialist is to aid those who suffered through physical, emotional, or financial harm as a result of a crime. A standard service provided by a Victim Specialist as part of the Victim Assistance Program ("VAP"), specifically described within the records at issue, is to accompany SAs to interviews and provide a critical link between the SAs and the victims. VAP helps victims cope and recover from the harm endured while allowing the SAs to continue moving the investigation forward. Protection of the Victim Specialists' identities is not only imperative for their safety, but also for the victims' safety and allows the victims to confide in FBI personnel involved in the investigation. Thus, disclosure of this information would constitute a clearly unwarranted invasion of the Victim Specialists'

personal privacy; and the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

### (b)(6)-3 AND (b)(7)(C)-3: NAMES AND OTHER IDENTIFYING INFORMATION OF THIRD-PARTY VICTIMS

(108)    Within Exemption categories (b)(6)-3 and (b)(7)(C)-3, the FBI withheld the names and other identifying information of third-party victims. *See* Exhs. S and T.  Releasing information pertaining to these individuals' identity in the context of the records at issue could cause embarrassment to these victims, as well as causing unsolicited and unnecessary attention to be focused on them.  Such a release could force them to relive emotionally trying events, causing further invasion of their privacy, in excess of the harm they have already suffered.  Thus, these victims maintain strong privacy interests in the protection of their personal identifying information.  Furthermore, there is no legitimate public interest to be served by releasing the identities of these victims because their identities, themselves, would not shed light on the operations and activities of the FBI.  The FBI determined that disclosure of this information would constitute a clearly unwarranted invasion of these individuals' personal privacy, and consequently properly withheld this information pursuant to FOIA Exemptions 6 and 7(C).  The FBI asserted these exemptions, at times in conjunction with Exemptions 3 and 7(D).

### (b)(6)-4 AND (b)(7)(C)-4: NAMES AND OTHER IDENTIFYING INFORMATION OF LOCAL LAW ENFORCEMENT PERSONNEL

(109)    Within Exemptions categories (b)(6)-4 and (b)(7)(C)-4, the FBI withheld the names and other identifying information of local law enforcement employees. *See* Exhs. S and T.  These employees were acting in their official capacity and aided the FBI in the law enforcement investigative activities reflected in the records responsive to Plaintiff's request.  The rationale for protecting the identity of FBI SAs and professional personnel, discussed in ¶¶ 110-

112, *supra*, applies equally to the names and other identifying information of these local law enforcement employees. Release of the identities of these law enforcement employees could subject them as individuals to unnecessary and unwelcome inquiries regarding the investigation and to harassment that would invade their privacy and could cause them to be targeted for reprisal. In contrast, disclosure of this information would serve no public interest because it would not shed light on the operations and activities of the FBI. Accordingly, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

### (b)(6)-5 AND (b)(7)(C)-5: NAMES AND OTHER IDENTIFYING INFORMATION OF THIRD PARTIES MERELY MENTIONED

(110)    Within Exemptions categories (b)(6)-5 and (b)(7)(C)-5, the FBI withheld the names and other identifying information of third parties who were merely mentioned in the investigative records responsive to Plaintiff's request. *See* Exhs. S and T. The FBI has information about these third parties in the records because these individuals were tangentially mentioned in conjunction with FBI investigative efforts. These individuals were not of investigative interest to the FBI. These third parties maintain substantial and legitimate privacy interests in not having their information disclosed and thus, being connected with an FBI law enforcement matter. Considering the FBI is an investigative and intelligence agency, disclosure of these third parties' names or other identifying information in connection with an FBI investigation carries an extremely negative connotation. Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. The FBI considered whether there was any public interest that would override these privacy interests and concluded that disclosing information about individuals who were merely mentioned in an FBI investigative file would not significantly increase the public's understanding of the operations and activities of the FBI. Accordingly, the FBI properly

withheld this information pursuant to FOIA Exemptions 6 and 7(C).

### (b)(6)-6 AND (b)(7)(C)-6: NAMES AND OTHER IDENTIFYING INFORMATION OF NON-FBI FEDERAL GOVERNMENT PERSONNEL

(111)   Within Exemption categories (b)(6)-6 and (b)(7)(C)-6, the FBI withheld the names and other identifying information of personnel from non-FBI, federal government agencies who provided information to or otherwise assisted the FBI in its investigation of Jeffrey Epstein. *See* Exhs. S and T. The rationale for protecting the identity of other government employees is the same as the rationale for protecting the identity of FBI employees. *See* ¶¶ 104-107, *supra*. Publicity, adverse or otherwise, concerning the assistance of these other government agency employees in an FBI investigation would seriously impair their effectiveness in assisting or otherwise participating in future FBI investigations. The privacy consideration also protects these individuals from unofficial questioning as to the FBI investigation. It is possible for a person targeted by law enforcement actions to carry a grudge, which may last for years, and to seek revenge on the personnel involved in those activities. Disclosure of the name or other identifying information of these individuals in connection with this investigation could trigger hostility toward them. Therefore, these government agency employees maintain substantial privacy interests in not having their identity disclosed in this context. In contrast, there is no public interest to be served by the disclosure of their identifying information because identities, by themselves, would not significantly increase the public's understanding of the FBI's operations and activities. Accordingly, the FBI properly withheld this information pursuant to FOIA Exemptions 6 and 7(C).

### (b)(6)-7 AND (b)(7)(C)-7: NAMES AND OTHER IDENTIFYING INFORMATION OF STATE AND LOCAL GOVERNMENT PERSONNEL (NON-LAW ENFORCEMENT)

(112)   Within Exemptions categories (b)(6)-7 and (b)(7)(C)-7, the FBI withheld the

names and other identifying information of state and local government personnel. *See* Exh. S.

The rationale for protecting the identity of local law enforcement personnel discussed in ¶ 109,

*supra*, applies equally to the names and other identifying information of these non-law

enforcement, state and local government employees.  Release of their identity could subject them

as individuals to unnecessary and unwelcome inquiries regarding the investigation that is the

subject of the records at issue and to harassment that would invade their privacy and could cause

them to be targeted for reprisal.  In contrast, disclosure of this information would serve no public

interest because it would not shed light on the operations and activities of the FBI.  Accordingly,

the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

### (b)(6)-8 AND (b)(7)(C)-8: NAMES AND OTHER IDENTIFYING INFORMATION OF THIRD PARTIES WHO PROVIDED INFORMATION

(113)   Within Exemption categories (b)(6)-8 and (b)(7)(C)-8, the FBI withheld the

names and other identifying information of individuals who were interviewed by, or provided

information by other means to, the FBI during the course of its investigation of Jeffrey Epstein.

*See* Exh. S.  The identifying information of, and information provided by, these third-party

individuals appears within the FBI's investigative file because these individuals willingly

divulged information relevant to the FBI's investigative efforts.  Plaintiff has not provided a

privacy waiver from the third parties authorizing release of their information, nor has Plaintiff

supplied proof of death; therefore, these individuals maintain substantial and legitimate privacy

interests in not having their cooperation or connection to the FBI and the investigation at issue

disclosed.  Considering the FBI is an investigative and intelligence agency, disclosure of these

individuals' names or other identifying information in connection with FBI records carries an

extremely negative connotation.

(114)   The FBI has found that interviewing individuals or otherwise obtaining

information from individuals based on their personal knowledge is one of the most productive investigative tools for law enforcement agencies. The largest obstacle to successfully obtaining information, often critical to FBI investigations, through an interview or otherwise, is fear by the individuals providing the information their identity will be exposed. Such exposure, in conjunction with their cooperation with law enforcement, could lead to harassment, intimidation by investigative subjects, legal or economic detriment, physical harm, or even death. In order to surmount this fear of reprisal, and the resulting tendency to withhold information, persons who provide information to the FBI must be assured that their name and other personally identifying information will be held in the strictest confidence. Thus, the FBI has determined that these individuals maintain substantial privacy interests in not having their identity disclosed. In contrast, the FBI could identify no public interest in the disclosure of this information because disclosure of these third parties' names and other identifying information would not shed light on or significantly increase the public's understanding of the operations and activities of the FBI. Furthermore, the continued access by the FBI to persons willing to truthfully relate pertinent facts bearing upon a particular investigation far outweighs any benefit the public might derive from disclosure of the names of those who provided information to the FBI. Accordingly, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C). The FBI is also relying on Exemption 7(D) to protect this information in many instances.

### EXEMPTION 7(D) – CONFIDENTIAL SOURCE INFORMATION

(115) Exemption 7(D) protects "records or information compiled for law enforcement purposes" when disclosure:

> could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information

62

> compiled by criminal law enforcement authority in the course of a
> criminal investigation or by an agency conducting a lawful national
> security intelligence investigation, information furnished by a
> confidential source.

5 U.S.C. § 552(b)(7)(D).

(116)   Numerous confidential sources report to the FBI on a regular basis; they provide

information under an express assurance of confidentiality.  Others are interviewed or provide

information under an implied assurance of confidentiality (i.e., under circumstances from which

an assurance of confidentiality may be inferred).  In either situation, these sources are considered

to be confidential because they furnish information only with the understanding that their

identity and the information they provide (outside of investigative use) will not be divulged

outside the FBI.  Information provided by these sources is often singular in nature, such that it

may be distinct and thus traceable to a specific individual and, if released, could reveal his or her

identity.  The FBI has learned through experience that sources assisting, cooperating with, and

providing information to the FBI must be free to do so without fear of reprisal.  The FBI has also

learned that sources must be free to furnish information to the FBI with complete candor and

without the understandable tendency to hedge or withhold information because of fear that their

cooperation with the FBI will be made public.  Sources providing information to the FBI should

be secure in the knowledge that their assistance and their identity will be held in confidence.

(117)   The release of a source's identity would forever eliminate that source as a means

of obtaining information.  In addition, when the identity of one source is revealed, that revelation

has a chilling effect on the activities and cooperation of other sources.  Such a result undermines

one of the FBI's most important means of obtaining information and could thereby severely

hamper law enforcement efforts to detect and apprehend individuals engaged in the violation of

federal criminal laws.

### (b)(7)(D)-1: NAMES AND OTHER IDENTIFYING INFORMATION OF INDIVIDUALS AND INFORMATION PROVIDED BY THESE INDIVIDUALS UNDER AN IMPLIED ASSURANCE OF CONFIDENTIALITY

(118)   Within Exemption category (b)(7)(D)-1, the FBI withheld the names and other identifying information of individuals and information provided by these individuals under circumstances in which confidentiality can be inferred.  *See* Exh. S.  These individuals provided information concerning the activities of subjects of investigative interest to the FBI. Considering: (1) the singularity of the information provided and the likelihood that these individuals could be identified through release of this information by those familiar with the events described; (2) the proximity of these individuals to the investigative subjects and events described; and (3) the nature of the criminal acts described, the FBI inferred that these individuals provided this information only because they believed their cooperation with the FBI, and the information provided (outside of its investigative use), would remain confidential.

(119)   The FBI protected the identifying information of, and information provided by (outside of its investigative use), individuals who conveyed critical information regarding certain criminal activities.  These individuals were in unique positions allowing them ready access to and/or knowledge about investigative subjects and others involved in child prostitution or trafficking of a minor.  Such access exposed them to potentially significant harm should their association and cooperation with the FBI be disclosed.  One reason they risked harm when cooperating is because they were within the orbit of suspected criminals, and such criminals (in the FBI's experience) typically seek to deter cooperation with law enforcement through reprisal. Such reprisal can take many forms, to include defamation of the source's character among their peers or family; economic reprisal (deprivation of employment or business opportunities); violent threats aimed at instilling fear and doubt; or even violence itself.  Even amidst these

potential harms, these individuals provided specific, detailed information that is singular in nature, i.e., only a few individuals would be privy to such information. Thus, the FBI determined that disclosure of their identity or the information provided (outside of its investigative use) could subject them, as well as their families, to retaliation or other type of backlash, should their information be disclosed.

(120)   Considering the circumstances described above, it is reasonable to infer that these individuals cooperated with the FBI only because they expected their identity and the information provided (outside of its investigative use) would be held in confidence. Therefore, the FBI properly withheld this information pursuant to Exemption 7(D).

### (b)(7)(D)-2: Names and Other Identifying Information of Individuals and Information Provided by These Individuals Under an Express Assurance of Confidentiality

(121)   Within Exemption category (b)(7)(D)-2, the FBI withheld the names and other identifying information of individuals and information provided by these individuals under an express assurance of confidentiality. *See* Exh. S.  When processing the records at issue, the FBI found evidence certain individuals, who provided specific and detailed information that is singular in nature, either requested that their identity not be revealed or FBI investigators would have, by standard practice, expressly promised them that their identity and the information provided (outside of its investigative use) would remain confidential.

(122)   Providing an express assurance of confidentiality is essential to the FBI's ability to obtain relevant and accurate information from cooperating witnesses ("CW") and CHSs. The designation of CW or CHS is a positive indication that these individuals entered into official, confidential relationships with the FBI in which they would have, by standard FBI practice, been provided with an express assurance of confidentiality. Without this assurance by the FBI, those

with access to information critical to FBI investigations may be reluctant to provide information or may modify their statements to lessen the severity of any backlash; therefore, the FBI must provide a credible assurance of confidentiality to these individuals to obtain factual, relevant, and timely information. Releasing these sources' identity, or any singular information provided that could lead to the revelation of their identity, would also display an unwillingness by the FBI to honor its assurance of confidentiality to current and future sources. Therefore, releasing this information would have a lasting negative impact on the FBI's confidential source program by greatly hindering the FBI's ability to maintain sources willing to provide accurate and relevant information pertaining to criminal activities.

(123)   In sum, the FBI located evidence that certain individuals supplied information to the FBI with the express assurance that their name and other identifying information, and the information provided (outside of investigative use), would be held in confidence. Release of such information would endanger these confidential sources and cause great detriment to the FBI's ability to recruit and maintain reliable confidential sources. Thus, the FBI properly withheld this information pursuant to Exemption 7(D).

### (b)(7)(D)-3: FOREIGN GOVERNMENT AGENCY INFORMATION PROVIDED UNDER AN IMPLIED ASSURANCE OF CONFIDENTIALITY

(124)   Within Exemption category (b)(7)(D)-3, the FBI withheld information provided to the FBI from a foreign government agency under circumstances in which confidentiality can be inferred. *See* Exhs. S and T. The FBI, in a wide variety of criminal and national security investigations, solicits and receives information regularly from state, local, and foreign agencies. Inherent in the cooperative effort is the mutual understanding that the identity of such a source and the information provided by it (outside of its investigative use) will be held in confidence by the FBI, and not publicly released. If disclosure of the information provided in confidence is

publicly disclosed, then cooperation between the FBI and these and other foreign agencies would be greatly diminished. The release of official United States Government documents that reveal the existence of a confidential relationship with a foreign government agency reasonably could be expected to strain relations between the United States and the foreign government agency and lead to diplomatic, political, or economic retaliation. Moreover, a breach of this relationship can be expected to have a chilling effect on the free flow of vital information to United States law enforcement agencies, which may substantially reduce their effectiveness. Accordingly, the FBI properly withheld this information pursuant to Exemption 7(D).

### (b)(7)(D)-4: INFORMATION PROVIDED BY LOCAL LAW ENFORCEMENT AGENCIES UNDER AN IMPLIED ASSURANCE OF CONFIDENTIALITY

(125)   Within Exemption category (b)(7)(D)-4, the FBI withheld information (outside of its investigative use) provided by local law enforcement agencies under an implied assurance of confidentiality. *See* Exh. S. The FBI does not infer that all local law enforcement agencies who cooperate in federal investigations do so with the expectation of confidentiality. However, under some circumstances, such an expectation may be inferred. In the records at issue, local law enforcement agencies provided specific detailed information of value to the FBI that is singular in nature concerning Jeffrey Epstein. The FBI inferred that these agencies provided this information to the FBI with an expectation that their involvement in the investigation, and the information provided (outside of its investigative use), would remain confidential due to the following: the information provided pertains to non-public investigations pursued by these agencies; or the information would expose the agency's personnel to undue public scrutiny based on its involvement in particular matters.

(126)   The FBI relies heavily on assistance from its local law enforcement partners in its investigations. The disclosure of this information could have disastrous consequences. If this

information is publicly released, these local law enforcement agencies would be less likely to freely share sensitive information with the FBI. Release could also harm the FBI's ability to seek assistance from these agencies during future investigations. Additionally, the FBI's disclosure of such information could: (1) jeopardize these agencies' investigative techniques and procedures as disclosure would allow criminals to predict and circumvent use of these techniques and procedures; (2) discredit these local law enforcement agencies in the eyes of current and future confidential sources greatly hindering their ability to recruit valuable sources; and (3) jeopardize non-public investigations conducted by these agencies. Accordingly, it is reasonable for the FBI to infer that these local law enforcement agencies provided certain information to the FBI under circumstances in which an assurance of confidentiality can be implied. Thus, the FBI properly withheld this information pursuant to Exemption 7(D).

## EXEMPTION 7(E)
### INVESTIGATIVE TECHNIQUES AND PROCEDURES

(127)    FOIA Exemption (b)(7)(E) provides protection for:

> law enforcement records or information [which]…would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7)(E).

(128)    Within the responsive records, the FBI applied Exemption 7(E) to non-public investigative techniques and procedures utilized by the FBI in its investigations, and to non-public details about techniques and procedures that are otherwise known to the public. Specifically, the FBI asserted Exemption 7(E) to protect the following categories of information.

### (b)(7)(E)-1: COLLECTION METHODS AND ANALYSIS OF INVESTIGATIVE INFORMATION OBTAINED DURING SEARCHES OF INTERNAL FBI DATABASES

(129)   Within Exemption category (b)(7)(E)-1, the FBI withheld the methods the FBI uses to collect and analyze information it obtains for investigative purposes. *See* Exh. S and Exh. T (Bates-numbered pages FBI 20-cv-1527-7-8, 14-15, 18, 20, 175, 185, 191, 340-345, 350-352, 354-355, 357-358, 405, 734, 787, and 1034). The release of this information would identify methods used in the collection and analysis of information, including how and from where the FBI collects information and the methodology employed to analyze it once collected. Disclosure would enable subjects of FBI investigations to circumvent these or similar techniques, which would diminish their relative utility. In addition, disclosure would facilitate the accumulation of information by investigative subjects regarding the circumstances under which specific techniques are used or considered for use. Release of this type of information would enable criminals to educate themselves about the techniques employed for the collection and analysis of information, which would, in turn, allow such individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to engage in violations of the law. Accordingly, the FBI properly withheld this information pursuant to Exemption 7(E).

### (b)(7)(E)-3: Sensitive File Numbers

(130)   Within Exemption category (b)(7)(E)-3, the FBI withheld sensitive investigative file numbers. *See* Exh. S. The FBI determined that application of this exemption is appropriate to withhold particular, non-public file numbers because release would identify the investigative interest or priority given to particular matters. As with non-sensitive file numbers or UCFNs, these file numbers contain three separate portions. *See* ¶ 36, *supra*. The first portion consists of the file classification number, which indicates the type of investigative or intelligence-gathering program to which the file pertains. Many of the FBI's file classification numbers are publicly

known, which makes disclosure of non-public file classification numbers even more revealing.

For example, revealing that the FBI has a money laundering investigative file on a subject who

was only known to be investigated for crimes related to public corruption, would reveal key non-

public information about the subject and investigation. Additionally, releasing non-public FBI

file classification numbers would reveal critical information about non-public investigative

techniques and procedures, and provide criminals and others with the ability to discern the types

of highly sensitive investigative strategies the FBI pursues whenever such file classification

numbers are present.

(131)    The protected investigative file numbers also contain two-letter office of

origination codes, indicating which FBI field office (or legat) originated the investigation at

issue. Disclosing this information, in many instances, would provide critical information about

where and how the FBI detected particular criminal behavior or national security threats, and

reveal key pieces of information about the FBI's non-public investigations or intelligence or

evidence gathering sources and methods by revealing FBI interests in a field office's area of

responsibility. Releasing this information could also provide significant information about the

FBI's failure to detect certain types of criminal behavior. For example, a criminal operating out

of San Francisco, California, with ties to a criminal organization under investigation in the FBI's

Seattle Field Office could request the Seattle Field Office's investigative file. If the FBI

disclosed all the originating office codes in that investigative file and there was no indication the

FBI ever pursued an investigation in San Francisco, the criminal could reasonably assume that

the FBI failed to locate evidence of his or her wrongdoing, emboldening him or her to continue

illegal activities, undeterred.

(132)    The third portion of the UCFN is the assigned string of numbers for the particular

subject matter under investigation. Releasing this information would provide criminals with a tracking mechanism by which they can place particular files and thus, investigations, within the context of larger FBI investigative efforts. The release of all three components of sensitive, non-public investigative file numbers would provide criminals with an idea of how FBI investigations may be interrelated and, potentially, when, why, and how the FBI pursues or pursued different investigations. This would provide criminals with a means of judging where the FBI allocates its limited investigative resources, how the FBI responds to different investigative circumstances, what the FBI knows and when and how it obtained that knowledge, and if there are knowledge gaps in the FBI's evidence or intelligence.

(133)   In summary, releasing sensitive, non-public FBI investigative file numbers would allow criminals to obtain an exceptional understanding of where, who, what, when, why, and how the FBI investigates certain violations of federal criminal law. Release of this information would enable criminals to predict actions the FBI may take in certain types of investigations and they may structure their behavior in response to avoid detection or disruption by the FBI, enabling them to circumvent the law. Accordingly, the FBI properly withheld this information pursuant to Exemption 7(E).

### (b)(7)(E)-4: Types and Timing of Investigations

(134)   Within Exemption category (b)(7)(E)-4, the FBI withheld information pertaining to the type of investigation referenced in the records at issue. *See* Exh. S. Specifically, some of the information withheld, when referenced in connection to an actual investigation and not in general discussion, pertains to the type of investigation, e.g., whether it is a "preliminary" or "full" investigation, and the date that the FBI initiated the investigation. Disclosure of the type of investigation would inform criminals of the specific techniques and procedures that

investigators could use, because designation of an investigation as a "full" investigation permits

FBI investigators to use certain techniques and procedures, not permitted in a "preliminary"

investigation, as well as when the techniques and procedures could have been used.

Additionally, this information would give criminals valuable insight into how the FBI develops

its investigations.  Disclosure of this information could also inform criminals of the types of

activities that could trigger a full investigation as opposed to a preliminary investigation.

(135)  Disclosing the particular dates an investigation covers could provide insight into

when the FBI obtained certain information.  Revealing how investigations are categorized would

reveal the investigative "toolbox" available to FBI investigators in certain situations.  Releasing

this information would allow criminals to predict the FBI's actions and investigative strategies

used when investigating certain crimes or national security threats.  Such a release would enable

criminals to stay one step ahead of FBI investigators and enable them to circumvent the law.

Furthermore, revealing this information could show the type of criminal behavior or intelligence

that predicated the initiation of a particular type of investigation.  This could potentially reveal

key information about the FBI's intelligence sources and methods, and the FBI's capabilities to

gather evidence of potential criminal activities through certain investigative techniques.

Disclosure could thus reveal key information about the FBI's investigative capabilities, allowing

criminals to educate themselves on how they might avoid detection or disruption of their

activities by the FBI.  Release of this information would allow investigative subjects to predict

FBI investigative strategies and adjust their behavior accordingly.  Moreover, revealing that a

specific activity in general warrants investigation could cause individuals to adjust their conduct

to avoid investigative scrutiny by the FBI.  Thus, disclosing information related to the type and

timing of investigations could enable criminals to structure and time illegal activities to

circumvent the FBI's attempts to enforce federal criminal laws. Therefore, the FBI properly

withheld this information pursuant to Exemption 7(E). The FBI asserted this exemption

category, at times in conjunction with Exemptions 3, 6, and 7(C).

### (b)(7)(E)-5: INFORMATION REGARDING TARGET, DATES, AND SCOPE OF SURVEILLANCE

(136)   Within Exemption category (b)(7)(E)-5, the FBI withheld information concerning

the target, dates, and scope of the surveillance operation conducted by the FBI in relation to the

investigation at issue. *See* Exh. S and Exh. T (Bates-numbered pages FBI 20-cv-1527-1, 5-8, 11,

13-15, 18-20, and 22). The FBI utilized surveillance operation(s) to obtain investigative

intelligence relevant to the investigation of Jeffrey Epstein. Certainly, it is publicly known that

the FBI and other law enforcement agencies engage in different types of surveillance in

investigations. However, disclosure of non-public details about who, when, how, and under

what circumstances the FBI conducts surveillance would allow current and future subjects of

FBI investigations and other potential criminals to develop and utilize countermeasures to defeat

or avoid different types of surveillance, thus rendering the technique useless to the FBI and other

law enforcement agencies. This is especially true because the success of investigative

surveillance hinges on an investigator's ability to remain undetected. Revealing non-public

details about the FBI's methodology for conducting surveillance could potentially jeopardize the

FBI's ability to operate surveillance covertly, and risks circumvention of the law. Accordingly,

the FBI properly withheld this information pursuant to Exemption 7(E).

### (b)(7)(E)-6: STATISTICAL INFORMATION CONTAINED IN EFFECTIVENESS RATING FD-515

(137)   Within Exemption category (b)(7)(E)-6, the FBI withheld certain sensitive

investigative information located within standardized FBI FD-515 forms. *See* Exh. S. FD-515s

are forms used by FBI personnel to report investigative accomplishments. FD-515s are

submitted at various stages of an investigation to report important events such as an arrest, conviction, sentencing, asset seizure, and disruption and dismantlement of a criminal enterprise. The FBI asserted Exemption 7(E) to withhold from disclosure statistical information concerning effectiveness ratings assigned to various FBI investigative techniques. At the upper right-hand side of this form is a block captioned "Investigative Assistance and Techniques Used." This block lists numerous publicly known investigative techniques and types of assistance, some of which were used during the FBI's investigation of Jeffrey Epstein. Opposite each investigative technique and type of assistance is a rating column which records a numerical rating from 1 to 4 to rate each technique or type of assistance used by investigative personnel during the course of an investigation. The numerical rating evaluates the effectiveness of each technique and type of assistance used in bringing the investigation to a successful conclusion. The entire rating column has been redacted in the records at issue to withhold the various techniques and types of assistance employed in the investigation at issue and the effectiveness of those techniques and types of assistance. If the rating columns are released, along with the ratings of each technique and type of assistance, then individuals involved in similar criminal activities could alter their behavior and modus operandi to circumvent and avoid detection and disruption by the FBI. Therefore, the FBI properly withheld this information pursuant to Exemption 7(E).

(138)  Additionally, the FBI asserted Exemption 7(E) to withhold information in the "Assisting Agencies" portion of the FD-515s within the responsive records. This was done to neither confirm nor deny if any other federal or state or local agency assisted the FBI in its investigation. Affirmatively acknowledging which law enforcement agency or agencies (whether state, local, or other federal) assisted the FBI in its investigative efforts risks confirming non-public investigative interests of other law enforcement agencies by revealing their interests

in the subject. Such revelations would allow subjects to predict law enforcement actions, modify their behavior in a manner which avoids the investigative efforts of law enforcement, and enable them to circumvent the law. Furthermore, if this portion of the FD-515 is blank, thus revealing that no other agency assisted the FBI, then criminals would be able to discern if some of their criminal behavior has gone undetected, which risks emboldening such criminals to continue their criminal activities. It would also allow them to judge law enforcement agencies' strengths and weaknesses in regard to detecting and disrupting particular criminal activity; to structure their activities to exploit this knowledge; and to successfully evade law enforcement agencies' efforts to enforce the law. Accordingly, by redacting this portion of the FD-515, the FBI is able to avoid the substantial law enforcement circumvention risks enumerated above. Thus, the FBI properly withheld this information pursuant to Exemption 7(E).

(139)    Finally, the FBI applied Exemption 7(E) to withhold assigned "Subject Description Codes." A listing of these codes is typically attached to each FD-515. Revealing an assigned code in conjunction with an individual indicted or arrested or even convicted would immediately inform individuals of the nature of FBI's gathered criminal intelligence on the individual and the level of the FBI's investigative focus. This would, in turn, enable criminals to determine whether or not the FBI has detected particular criminal activities, thus enabling them to preemptively destroy incriminating evidence and emboldening them to continue criminal activities. For example, if the FBI labeled someone convicted of a crime as an "8A – All Other Subjects," it would be very telling should this person actually be the boss of a criminal enterprise. This individual would be able to ascertain that the FBI does not know the totality of his or her criminal activities. Furthermore, if a criminal is convicted of money laundering crimes, but is labeled as a "4A – Known Member of a Terrorist Organization," the individual would

know that the FBI is investigating them for additional criminal activities that may not have been publicly disclosed. This would enable the criminal to preemptively cut ties with his or her terrorist associates and destroy incriminating evidence to avoid further prosecution. In sum, the FBI determined that releasing subject description codes would enable criminals to discern FBI investigative focuses and the nature of its gathered criminal intelligence, enabling criminals to predict and thwart FBI investigative efforts, and thus circumvent the law. Thus, the FBI properly withheld this information pursuant to Exemption 7(E).

### (b)(7)(E)-7: DATABASE IDENTIFIERS AND PRINTOUTS

(140)   Within Exemption category (b)(7)(E)-7, the FBI withheld the identities of sensitive investigative databases and database search results located through queries of these non-public databases used for official law enforcement purposes by the FBI.  *See* Exh. S and Exh. T.  The processed records included internal database search results of investigatory records. *See specifically* Exh. T (Bates-numbered pages FBI 20-cv-1527-205, 207, 209, 211, 213-214, 216, 218, 220, and 268-278).

(141)   Releasing the identities of these databases and any information located through queries of these databases would give criminals insight into the available tools and resources the FBI uses to conduct criminal and national security investigations (i.e., the scope of information stored within the databases, how the FBI uses the databases to support its investigations, the types of information most valued by the FBI for particular investigations, and vulnerabilities of the databases).

(142)   Revealing the use of these databases in the context of the investigative records at issue, and the information generated through queries of these databases, would reveal the nature of their utility to FBI investigators and the scope of information stored therein.  Disclosing when

and why the FBI queries these databases would reveal key information about FBI investigative strategies. This is because different investigative databases contain varying datasets and revealing the types of data sought by investigators in particular investigative circumstances would reveal the strategies employed in response to different investigative circumstances. Additionally, disclosing the search results for particular subjects would provide criminals with an understanding of the scope of the FBI's collected intelligence on particular subjects. It would expose possible intelligence gaps and intelligence gathering strengths, which would, in turn, allow criminals to make informed decisions on how to structure their behavior to exploit these strengths and weaknesses and avoid detection and disruption by the FBI.

(143)    Revealing the types of information stored in these databases would also reveal the types of information most useful to FBI investigators. This would provide criminals with an understanding of how they might structure their behavior and deploy countermeasures to deprive the FBI of useful intelligence or evidence, thus jeopardizing the FBI's investigative function.

(144)    Finally, revealing the identities of these databases could jeopardize the FBI's investigative function by revealing exactly where the FBI stores and from where it obtains valuable investigative data. Knowing the database names makes the original source data an attractive target for compromise. It would provide criminals who gain access to FBI systems with an idea of where they can go to discover what the FBI knows and how it gathered the information, and possibly, information regarding the FBI's investigative strategies. It would also offer these criminals the opportunity to corrupt or destroy information stored within the databases.

(145)    In summary, release of this information relative to FBI investigative databases impedes the FBI's effectiveness and potentially aids in circumvention of valuable investigative

techniques. Therefore, the FBI properly withheld this information pursuant to Exemption 7(E).

### (b)(7)(E)-9: MONETARY PAYMENTS AND FUNDING FOR INVESTIGATIVE PURPOSES

(146)   Within Exemption category (b)(7)(E)-9, the FBI withheld information about monetary amounts requested by FBI personnel or paid by the FBI in order to implement particular investigative techniques. *See* Exh. S. The FBI has limited resources that it must allocate strategically to effectively pursue its law enforcement and intelligence gathering functions. Revealing the amount of money the FBI has paid, or plans to pay, in order to implement certain investigative techniques, would reveal the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts and priority given to certain investigative matters. Revealing this level of focus would reveal how the FBI plans to allocate its limited resources and essentially paint a picture as to where the FBI's strengths and weaknesses lie within the spectrum of federal crimes it is mandated to investigate. Releasing this information would give criminals the opportunity to structure their activities in a manner which avoids the FBI's strengths and exploits its weaknesses. Because release of this type of information would enable criminals to circumvent the law, the FBI properly withheld it pursuant to Exemption 7(E).

### (b)(7)(E)-11 AND 14: INTERNAL FBI SECURE FAX NUMBER, NON-PUBLISHED INTERNAL PHONE NUMBERS, EMAIL AND IP ADDRESSES, AND INTRANET WEB ADDRESSES[44]

(147)   Within Exemption categories (b)(7)(E)-11 and 14, the FBI withheld an internal secure FBI fax number, non-published internal phone numbers, internal FBI e-mail and IP addresses, and non-public intranet addresses. *See* Exh. T (Bates-numbered pages FBI 20-cv-1527-1, 7, 9, 11-12, 16, 18, 20, 23, 46, 69, 112-113, 115, 132-133, 262-264, 267, 291, 293, 295,

---

[44] After further review of the processed records, the FBI determined that coded Exemption categories (b)(7)(E)-11 and 14 should be consolidated.

336-338, 369, 371, 412-413, 420, 480, 503, 514-515, 566-567, 578-580, 591-592, 617-618, 624-

625, 631-633, 635-636, 657, 667-669, 680-681, 686, 723-724, 728-729, 732-733, 740, 751-753,

765-767, 796-798, 813-814, 830-831, 840-842, 847-848, 856-858, 869-870, 877-881, 909-911,

921-923, 932-934, 941-943, 950-952, 961-963, 980-981, 988-990, 997-999, 1076-1078, 1093-

1095, 1102-1105, 1126-1128, 1139-1140, 1147-1148, 1157-1158, 1176-1177, 1186-1188, 1203-

1205, 1221-1223, 1232-1234, 1250-1252, 1261-1263, 1293-1295, 1311-1314, 1335-1336, 1345-

1346, 1351-1354, 1360-1363, 1392-1394, 1409-1411, 1416-1418, 1433-1434, 1445-1446, 1450-

1451, 1487-1488, 1497-1498, and 1501-1502).  Release of this information would provide

criminals with specific targets for possible cyberattacks and attacks on FBI secure

communications.  Considering the current cyber-security environment where government data

breaches and other hacking attempts on government systems are prevalent, it is likely that the

release of this type of information could provide hackers with avenues to exploit the FBI's

information technology ("IT") system. It is possible they could use this information to gain

unauthorized access to FBI systems, view and manipulate sensitive investigative data, interfere

with the FBI's non-public intranet protocol, or hinder the FBI's ability to enforce the law by

disrupting the FBI's internal communications.

(148)   The internal fax number, phone numbers, and email and IP addresses are used

routinely by FBI personnel in carrying-out the FBI's law enforcement function.  Releasing this

information could subject the FBI to receipt of a massive number of disruptive and possibly

misleading communications, as well as threats, thus disrupting official business and subjecting

FBI employees to harassing faxes, phone calls, and e-mails seeking information concerning FBI

investigations. It could also enable circumvention of the law by allowing criminals to gain access

to the FBI's internal communication channels.  As such, release of this information would

impede the ability of the FBI to conduct and conclude investigations in a timely manner and could enable criminals to circumvent the law. Moreover, as discussed above, names and other identifying information of FBI SAs and professional staff are protected from disclosure pursuant to FOIA Exemptions 6 and 7(C). *See* ¶¶ 104-107, *supra*. The vast majority of FBI internal email addresses include at least part of the person's name associated with the email address. In addition, once a secure fax or internal FBI personnel's phone number is released, the identity of the SA and FBI personnel associated with those numbers, and, in turn, the investigations they are working on, can be ascertained.

(149)    Additionally, releasing internal intranet addresses would provide criminals with potential targets for cyber-attacks and computer intrusions. Armed with specific intranet web addresses, criminals able to access the FBI's computer systems, would know where, within the computer systems, to locate information that could be used to disrupt or otherwise undermine FBI operations or to gain access to original investigative records. Disruption could be achieved by deleting, changing, or corrupting the data housed at the intranet web addresses or by utilizing the location information for other nefarious purposes. Releasing this type of information does not just result in the release of an internal intranet address, it renders the associated computer systems vulnerable to attack, which, in turn, jeopardizes the information located at the addresses, which includes information regarding sensitive techniques and case strategies used in FBI investigations. The information located at the internal web addresses is intended to be accessed only by FBI employees who have the requisite clearance and need to know. These FBI employees rely on the validity of this information when conducting investigations and performing other day-to-day work.

(150)    The foreseeable harm of disclosing FBI internal web addresses is two-fold. First,

access to non-public investigative information, such as the type of information located in the records housed at the internal web addresses at issue, would allow criminals and others to ascertain when and under what circumstances the FBI employed and still employs certain strategies or used and still uses certain law enforcement techniques. This knowledge could be used to thwart future investigations, thus obstructing the FBI's efforts to detect and disrupt criminal activity. Second, corruption of data resulting from the unauthorized access to sensitive investigative information would enable criminals to avoid detection by law enforcement and circumvent the law, thus decreasing the FBI's effectiveness overall in investigating and preventing crimes and investigating threats targeting the United States. Thus, the FBI properly withheld this information pursuant to Exemption 7(E).

### (b)(7)(E)-12: INVESTIGATIVE FOCUS OF SPECIFIC SENSITIVE INVESTIGATIONS

(151)    Within Exemption category (b)(7)(E)-12, the FBI withheld the focus of specific non-public FBI investigations in the non-7(A) investigation processing pertaining to Jeffrey Epstein. *See* Exh. T (Bates-numbered pages FBI 20-cv-1527-9-12 and 16-17). The FBI's rational for protecting this information is two-fold. First, the protected information reveals details regarding FBI techniques used in investigations – how and what it examined in looking for leads and evidence from similar cases. It also reveals the leads explored with respect to the evidence obtained in these investigations. Disclosing such information would reveal the when, how, what, and why that allowed investigators to connect the dots between investigative subjects (Jeffrey Epstein and third parties of investigative interest) in an effort to trace illegal criminal activity including, aggregated threats, child sex trafficking, and other criminal activity. In general, this could harm other investigations by showing techniques used to investigate and build evidence in sex trafficking cases. Second, revealing the focus of specific investigations that are

not public could alert targets to the FBI's interest in in them and their activities (especially, the third parties of investigative interest) and alter them to the activities of which the FBI is aware and those of which the FBI is not aware.

(152)   Releasing this type of information would reveal key information about the FBI's intelligence and evidence gathering capabilities.  Revealing when and why the FBI pursues certain or shifts its investigative focus would reveal key information about the investigative information that the FBI possessed at particular points in time, and possibly when and how such information was obtained.  This could enable criminal sex trafficking subjects to discover non-public details about FBI intelligence and evidence gathering methods and help them determine how to modify their operational security to deprive the FBI of such critical intelligence and evidence.

(153)   In summary, releasing the focus specific FBI sex trafficking investigations would allow the subjects of these investigations to thwart efforts to investigate and disrupt their illegal activities, hurt the ability of investigators to pursue related investigations, provide key information about FBI investigative strategies for pursuing sex trafficking and child prostitution investigations, and reveal key information about the FBI's intelligence and evidence gathering capabilities, all of which would allow criminals to circumvent the law. Thus, the FBI properly withheld this information pursuant to Exemption 7(E).

### (b)(7)(E)-13: Internal FBI Search Slips

(154)   Within Exemption category (b)(7)(E)-13, the FBI withheld internal FBI search slips, which detail the subject-matter or event that FBI personnel searched in order to locate potentially responsive records. *See* Exh. T (Bates-numbered pages FBI 20-cv-1527-112 and 132). The search slips withheld by the FBI are related to FOIA requests for criminal

investigation or national security information related to Jeffrey Epstein. As compilations of applicable CRS-retrieved information, search slips contain identifying information, including, but not limited to, full name, alias, race, sex, weight, height, date of birth, place of birth, social security number, address, locality, telephone number, FBI Number, and other identifiers specific to the subject-matter or associated with the specific event searched. A search slip may also contain details of where the FBI searched to locate potentially responsive records, the date of the search, FBI personnel names or initials, and specific details concerning potentially responsive information located through its search, such as file numbers and the current status of investigations (e.g., pending or closed).

(155)   To disclose the details contained in FBI search slips could reveal the identity of classified or sensitive files numbers that reveal the file classification (type of investigation) and field office location involved with specific investigations. Additionally, such disclosure could reveal the number of investigations pertaining to a particular subject or event.[45]  In other words, search slips and related documents, such as printouts, provide an investigative roadmap revealing the size, nature, location, sensitivity, classification, and status of a particular investigative subject or event. Moreover, there is a reasonably foreseeable harm in releasing even small pieces of information from search slips because these pieces could establish a pattern or "mosaic" which would allow subjects to avoid specific locations, especially if one or more locations appears with frequency on a search slip or printout concerning a specific subject of an investigation. Once this type of information is revealed, the field office with expertise in a particular type of investigation

---

[45] Even if the FBI were to redact all personal identifying information and sensitive files numbers from the search slip and provide the shell document to requesters, requesters could potentially ascertain the scope of the FBI's investigation of a subject or event by the number of pages or amount of redaction boxes visible on the search slip.

would be known to subjects. This knowledge could allow a subject to employ countermeasures targeted toward concealing particular types of behavior and to avoid altogether activities in a particular location to elude detection. Accordingly, the FBI properly withheld this information pursuant to Exemption 7(E), cited at times in conjunction with Exemptions 5, 6, and 7(C).

## DESTROYED SERIALS

(156)    Retention and disposal of records are governed by statute and implemented by regulations under the supervision of the National Archives and Records Administration ("NARA"). *See* 44 U.S.C. § 3301, 36 C.F.R. Chap. 12, Subchap. B, Pt. 1228. The United States District Court for the District of Columbia has approved the FBI's Records Retention Plan and Disposition Schedules, which are enforced by NARA. IMD, in conjunction with NARA, determines if FBI records should be designated as temporary or permanent.

(157)    During its search of the CRS, the FBI located information in a 272 file series concerning a money laundering investigation which indicated that three serials had been destroyed in 2005, prior to the submission of Plaintiff's FOIA request and in accordance with established record retention and disposition schedules. Since these serials could not be reviewed, it is not known if they contained information responsive to Plaintiff's FOIA request.

## WITHHOLDING OF DOCUMENTS UNDER A COURT ORDER

(158)    The FBI withheld 38 pages in full per a Court Order issued by the United States District Court for the Southern District of Florida in Case Number 08-mj-08068-LRJ. The FBI conducted a search of the criminal case within the Public Access to Court Electronic Records ("PACER") system to see if an unsealing order had been filed pertaining to the sealed records responsive to Plaintiff's request. The FBI did not locate such an order. Additionally, on August 24, 2022, the FBI contacted the USAO and was notified that the Court Order was sealed pursuant

to Federal Grand Jury Information – Federal Rule of Criminal Procedure 6(e).  Therefore, the

FBI withheld responsive information subject to the sealing order, which precludes release of the

following pages:  Vault Bates-numbered pages 03956-1033 through 03956-1070.  Because of the

sealing order, these pages were not reviewed for applicable FOIA exemptions.  Should the court

lift the sealing order, the FBI respectfully requests the opportunity to assert applicable FOIA

exemptions.

## CONSULTATIONS WITH OTHER GOVERNMENT AGENCIES

(159)   The FBI consulted with DOJ, OIP, concerning its equities on Bates-numbered

pages FBI 20-cv-1527-146-148, 157-158, 159, 164, 674, 686, 693, 697, 699-700, 897, 907, and

1272-1273.  OIP defends its assertions of FOIA Exemptions (b)(5) and (b)(6) within the FBI

records for the specific withheld information in a separate declaration. **(Ex. U.)**

(160)   The FBI consulted with Executive Office for United States Attorneys ("EOUSA")

concerning its equites on Bates-numbered pages FBI 20-cv-1527-336 and 338.  EOUSA defends

its assertion of FOIA Exemption (b)(6) within the FBI records for the specific withheld

information in a separate declaration. **(Ex. V.)**

(161)   The FBI consulted with the United States Customs and Border Patrol ("CBP")

concerning its equities on Bates-numbered pages FBI 20-cv-1527-339, 346-349, and 362.  CBP

defends its assertion of FOIA Exemptions (b)(6) and (b)(7)(C) within the FBI records for the

specific withheld information in a separate declaration. **(Ex. W.)**

(162)   The FBI consulted with DOJ's Justice Management Division ("JMD"),

concerning its equities on Bates-numbered pages FBI 20-cv-1527-1054, 1129-1131, and 1167-

1169.  JMD defends its assertion of FOIA Exemption (b)(6) within the FBI records for the

specific withheld information in a separate declaration. **(Ex. X.)**

(163)  Finally, the FBI consulted with DOJ's CRM, concerning its equities on Bates-numbered pages FBI 20-cv-1527-388-391 and 1283-1286.  CRM defends its assertion of FOIA Exemption (b)(6) within the FBI records for the specific withheld information in a separate declaration.  **(Ex. Y.)**

## SEGREGABILITY

(164)  As discussed in ¶ 29, *supra*, the FBI previously processed (in response to a prior FOIA request) a total of 11,571 pages of Bates-numbered Vault records that are also responsive to Plaintiff's request:  181 pages were released in full ("RIF"), 1,051 pages were released in part ("RIP"), and 10,339 pages were withheld in full ("WIF").   Additionally, as discussed in ¶ 31, *supra*, the FBI processed a total of 1,505 responsive pages of newly processed other Bates-numbered records responsive to Plaintiff's request: 666 pages were RIF, 742 pages were RIP, and 97 pages were WIF.  Each of these categories is discussed below to further address segregability.

a.  Pages RIF.  Following its segregability review, the FBI determined that a total of 846 pages could be released in full without redaction as there is no foreseeable harm to an interest protected by a FOIA exemption.

b.  Pages RIP.  Following its segregability review, the FBI determined that 1,794 pages could be released in part with redactions per the identified FOIA exemptions cited herein. These pages comprise a mixture of information that could be segregated for release and information that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions.

c. <u>Pages WIF</u>.  Following its segregability review, the FBI determined that

10,436 pages required withholding in their entirety.  The FBI determined

that all the information on these pages is either fully covered by one or

more of the cited FOIA exemptions or any non-exempt information on

these pages is so intertwined with exempt information that no information

could be reasonably segregated for release.  Any further segregation of the

intertwined information would employ finite resources only to produce

disjointed words, phrases, or sentences, that taken separately or together,

would have minimal or no informational content.  Additionally, of the

10,339 pages of Vault records, the FBI withheld 38 pages because they

were determined to be sealed pursuant to a United States District Court

order, as described at ¶ 158, *supra*.  Also, of the 10,436 total pages WIF,

the FBI withheld 176 pages because they are duplicates of pages accounted

for elsewhere in the FBI's production.  It is the FBI's standard practice not

to process duplicate pages, as doing so expends finite processing resources

with a net result of no additional information being released to requesters.

### PART VI: THE FBI'S *GLOMAR* RESPONSE

(165)   The FBI relies on a *Glomar* response in instances in which, assuming that

responsive records existed, even acknowledging their existence would result in harm protected

against by one or more FOIA exemptions.[46]  To be credible and effective, the FBI must use a

---

[46] The phrase "*Glomar*" stems from a case in which a FOIA requester sought information concerning a ship named the Glomar Explorer, and the CIA refused to confirm or deny its relationship with the Glomar vessel because to do so would compromise the national security or divulge sources and methods.  *Phillippi v. CIA*, 655 F.2d 1325 (D.C. Cir. 1981).

*Glomar* response in all similar cases regardless of whether responsive records actually exist, including instances in which the FBI does not possess records responsive to a particular request. If the FBI were to invoke a *Glomar* response only when it actually possessed responsive records, the *Glomar* response would be interpreted as an admission that responsive records exist. The FBI has determined that merely acknowledging the existence or non-existence of records responsive to Plaintiff's requests would trigger harm to the interests protected by FOIA Exemptions (b)(6), (b)(7)(C), and (b)(7)(D), as described in more detail below.

### PRIVACY *GLOMAR* FOR THIRD-PARTY INFORMATION

(166)   When a requester seeks records concerning a third-party individual (as in Plaintiff's FOIA request), and the requester fails to provide to the FBI with a waiver of privacy signed by the third party or proof of death, or fails to provide sufficient justification that public interest in the information outweighs the third party's privacy interests, the FBI asserts a standard *Glomar* response pursuant to FOIA Exemptions 6 and 7(C) [5 U.S.C. §§ 552(b)(6), (b)(7)(C)]. As the FBI notified Plaintiff of its *Glomar* response as to Plaintiff's request concerning third parties, the FBI did not conduct a search for records in response to Plaintiff's request for records concerning victims of Jeffrey Epstein's crimes, any associates or recruiters of Jeffrey Epstein, a named Ohio attorney, or any of the other third-party individuals listed throughout Plaintiff's FOIA request, including an FBI employee.

(167)   Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes as discussed above. *See* ¶¶ 53-54, *supra*.

### *Privacy Glomar: FOIA Exemptions (b)(6) and (b)(7)(C)*

(168)   Pursuant to long-standing policy, instituted to protect the privacy rights of

individuals, the FBI will not confirm or deny the existence of law enforcement records about a third party in the absence of a privacy waiver or proof of death, unless the requester establishes a public interest in disclosure that outweighs the third party's privacy interests. It is well-recognized that individuals have substantial privacy interests in relation to being associated with law enforcement investigations because any such association can engender comment, speculation, and harassment; can be embarrassing and stigmatizing; and can, in some circumstances, result in physical harm or threats of harm or death. Statements by an individual alluding to or acknowledging an association with a law enforcement investigation do not extinguish the privacy interests of the third party or constitute a waiver of the third party's privacy interests.

(169)   If a requester establishes a public interest, then the FBI will balance that public interest against the third party's privacy interests. This balancing is done on a case-by-case basis. The FBI will process a request for and release non-exempt law enforcement records about a third party only if it determines that the public interest outweighs the individual's privacy interests after conducting the balancing analysis. The balancing analysis in each case is necessarily fact specific. Thus, each request must be treated individually, and the FBI must retain flexibility in the way in which it handles each request.

(170)   Here, Plaintiff has not submitted privacy waivers from the subjects of her requests, and to the FBI's knowledge, with the exception of Jeffrey Epstein, none of the listed subjects is deceased. Moreover, Plaintiff failed to establish a public interest sufficient to override these individuals' privacy interests and warrant the non-consensual disclosure of records – if they exist – about themselves. For purposes of Exemptions (b)(6) and (b)(7)(C), a public interest exists when disclosure of information about an individual would significantly

increase the public's understanding of FBI operations and activities. Plaintiff stated in her FOIA request for a full fee waiver based on public interest, that the release of the information will shed significant light on government operations and activities regarding the FBI's informant practices. Plaintiff has not demonstrated how records about these particular individuals would increase the public's understanding of the FBI's operations in this regard. In addition, the records with third-party information, if they exist concerning the sex trafficking and child prostitution investigation of Jeffrey Epstein, and other third parties of investigative interest, are exempt from release pursuant to FOIA Exemption 7(A).

(171)   With regard to the FBI employee named in Plaintiff's FOIA request, the FBI will not confirm or deny an FBI employee's involvement in any particular investigation because that could subject the employee to targeted attempts to obtain sensitive information to which the employee may have access due to his or her FBI employment. Furthermore, adversaries could co-opt the information in an attempt to impersonate the employee's identity in relation to agency business. Moreover, the FBI determined that, with regard to requests for FBI employee information, it cannot confirm or deny an employee's status with the FBI because FBI employees maintain substantial privacy interests. Public disclosure could reasonably be expected to draw negative and unwanted attention to these individuals, could result in their receipt of harassing inquiries, and otherwise stigmatize and adversely affect them. Accordingly, the FBI concluded that they maintain substantial privacy interests. Plaintiff presented no evidence of a public interest sufficient to override the very significant privacy interests of the third-party individuals. The individuals listed in Plaintiff's FOIA request have very tangible and significant privacy interests in the FBI neither confirming nor denying whether responsive records about them exist. Accordingly, the FBI concluded that acknowledging whether or not

responsive records exist would intrude on these individuals' privacy interests.

*Glomar Concerning Source Records: Exemption (b)(7)(D)*

(172)   As previously detailed, ¶ 7, *supra*, the FBI issued a *Glomar* response to the

portion of Plaintiff's FOIA request (*see* Exhibit A for Plaintiff's FOIA request) for confidential

human source ("CHS") records pertaining to Jeffrey Epstein, stating that the FBI can neither

confirm nor deny the existence of such records pursuant to FOIA Exemption (b)(7)(D), 5 U.S.C.

§ 552(b)(7)(D).

(173)   To the extent Plaintiff seeks records about a third-party individual alleged to be a

CHS without proof of official confirmation by the FBI, the FBI relies on a *Glomar* response

pursuant to FOIA Exemption (b)(7)(D).  Doing otherwise jeopardizes the FBI's confidential

sources and the FBI's CHS program.  If the FBI responded substantively in those instances when

the individual is not in fact a source, whether alive or deceased, but refused to confirm or deny

whether or not responsive records exist, this practice would itself reveal which individuals are

sources.  The harm from this type of disclosures would be two-fold.  First, it would endanger

current FBI sources as the FBI's FOIA responses could create a pattern where criminals could

easily discern who is and is not an FBI source.  This would expose FBI sources to reprisal, in

many forms, by those on whom they provided information and others who may think negatively

of their cooperation with the FBI.  Second, it would suggest an unwillingness on the part of the

FBI to take appropriate measures to ensure the safety and confidentiality of its sources.  This

would dissuade current and future sources from providing or continuing to provide critical, law

enforcement relevant information to the FBI.  Accordingly, the FBI must rely on a *Glomar*

response in any instance in which a requester seeks records about an alleged source, whether that

individual is alive or deceased.

(174)  As discussed above, Plaintiff's FOIA request seeks information about Jeffrey

Epstein, who Plaintiff alleged acted as a government informant.  The only evidence Plaintiff

offered as to Epstein's alleged CHS status is that "Mr. Epstein was identified as cooperating with

the FBI in an FBI document dated 9/18/08 on a child prostitution and forfeiture case against him.

In this document, the case agent advised that no federal prosecution would occur as long as

Epstein continued to uphold his agreement." *See* Plaintiff's FOIA request, Exhibit A, page 2,

paragraph 6.  The details in the referenced document show Epstein was being prosecuted by the

State of Florida and was complying with all conditions of his plea with the State of Florida,

which included providing information to the FBI.  The document states that, "no federal

prosecution will occur in this matter as long as Epstein continues to uphold his agreement with

the State of Florida."  Plaintiff provides no further evidence of Epstein's alleged FBI source

status then, or for the Epstein investigations at issue here.  Moreover, she has not provided any

documentation to suggest that the FBI, in particular, has officially acknowledged that Jeffrey

Epstein was an FBI source.  Thus, the FBI must refuse to confirm or deny whether or not

responsive records exist, as it does in any instance when records about an alleged confidential

source are sought, to prevent harm to these individuals and global harm to the viability of the

FBI's CHS program.

## CONCLUSION

(175)  The FBI performed adequate and reasonable searches for all responsive records

not subject to a *Glomar* response; processed all such records; and released all reasonably

segregable, non-exempt information from records responsive to Plaintiff's request that are

subject to the FOIA.  The FBI directed Plaintiff to responsive records posted to the FBI's Vault,

which were previously processed in response to a request by Radar Online. During the processing of that request, it was determined the balance of the investigatory records at issue are exempt pursuant to FOIA Exemption 7(A). The FBI conducted a categorical review of the records asserted underlying exemptions pursuant to FOIA Exemptions 1, 3, 5, 6, 7(C), 7(D), and 7(E). Also, the FBI located through subsequent searches for additional responsive records non-7(A) exempt investigatory records and administrative FOIA requests from other FOIA requesters for the same subject matter. These records were processed for segregable release to Plaintiff.

(176)   The FBI asserted a *Glomar* response as to the existence of any records identifying certain third-party individuals and concerning the CHS status of Jeffrey Epstein and the other individuals named in Plaintiff's request, pursuant to FOIA Exemptions 6, 7(C), and 7(D).

(177)   The FBI carefully examined the Vault records, the categorically denied records, and the other records and determined that the information withheld, if disclosed, would reveal classified information; reveal statutorily protected information; would reveal privileged information; could reasonably be expected to interfere with pending or prospective enforcement proceedings; would cause a clearly unwarranted invasion of personal privacy, or could reasonably be expected to constitute an unwarranted invasion of personal privacy; could reasonably be expected to disclose the identities of confidential human sources and the information provided (outside of its investigative use); and would disclose techniques and procedures used in law enforcement investigations. After extensive review of the documents at issue, I have determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through Z attached hereto are true and correct copies.

Executed this 30th day of August 2022.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia